IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID BROD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. NO. 4:20-CV-01854 |
| | § | |
| SPRINT/UNITED MANAGEMENT | § | |
| COMPANT, | § | |
| | § | |
| Defendant. | § | |
| | § | |

Charles H. Wilson
Texas Bar No. 0079767
Federal I.D. No. 34581
chawilson@littler.com
Ashley D. Thomas
Texas Bar No. 24090430
Federal I.D. No. 3088749
adthomas@littler.com

LITTLER MENDELSON P.C.
1301 McKinney Street
Suite 1900
Houston, TX  77010
Telephone:  713.951.9400
Facsimile:  713.456.2481

ATTORNEYS FOR DEFENDANT SPRINT/UNITED
MANAGEMENT COMPANY

Dated: March 26, 2021

## TABLE OF CONTENTS

PAGE

I.    SUMMARY OF THE ARGUMENT ................................................................. 1

II.   NATURE AND CURRENT STAGE OF THE PROCEEDING ...................................... 3

III.  INCORPORATION OF APPENDIX ................................................................. 3

IV.   PERTINENT UNDISPUTED FACTS ............................................................... 4

      A.    INTRODUCTION. ........................................................................... 4

      B.    SPRINT'S RELEVANT POLICIES......................................................... 4

            1.    SPRINT'S EQUAL EMPLOYMENT OPPORTUNITY POLICY........... 4

            2.    SPRINT'S CORRECTIVE ACTION POLICY ........................................ 5

            3.    SPRINT'S OPEN-DOOR AND ADR PROCESS.................................... 5

      C.    PERTINENT EVENTS DURING BROD'S EMPLOYMENT WITH
            SPRINT............................................................................................ 6

            1.    JOHN STEVENS' OBSERVATIONS OF BROD'S
                  PERFORMANCE. ...................................................................... 7

            2.    DAWN MCCARTER'S OBSERVATIONS OF BROD'S
                  PERFORMANCE. ...................................................................... 7

            3.    URIAS' OBSERVATIONS OF BROD'S PERFORMANCE
                  FROM APRIL TO AUGUST 2018. ................................................ 8

            4.    INVESTIGATION OF BROD'S AUGUST 15, 2018 ETHICS
                  COMPLAINT .......................................................................... 13

            5.    STEVENS CHANGES AUGUST 14, 2018 WARNING FROM
                  "FINAL" TO "WRITTEN." ....................................................... 18

            6.    URIAS' OCTOBER 10, 2018 WRITTEN WARNING. ........................ 19

            7.    BROD'S IMR REVIEW.............................................................. 20

            8.    URIAS' PERFORMANCE MANAGEMENT OF OTHER
                  DISTRICT MANAGERS ............................................................ 20

            9.    BROD'S RESIGNATION ............................................................ 21

V.    ARGUMENTS AND AUTHORITIES.............................................................. 22

      A.    SUMMARY JUDGMENT STANDARD.............................................. 22

      B.    PLAINTIFF'S AGE DISCRIMINATION AND RETALIATION
            CLAIMS FAIL AS A MATTER OF LAW.......................................... 22

            1.    PLAINTIFF CANNOT ESTABLISH THE PRIMA FACIE
                  ELEMENTS OF HIS AGE DISCRIMINATION CLAIMS. ................. 23

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

**2**.  PLAINTIFF CANNOT ESTABLISH THE PRIMA FACIE ELEMENTS OF HIS RETALIATION CLAIMS. ................................. 27

**3**.  BROD FAILS TO SHOW PRETEXT ..................................................... 29

VI.  CONCLUSION ................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguirre v. Valerus Field Solutions*,
  L.P., 2019 WL 2570069 (S.D. Tex. Jan. 23, 2019) ..................................................26

*Alkhawaldeh v. Dow Chem. Co.*,
  851 F.3d 422 (5th Cir. 2017) ................................................................................29, 30

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................................................22, 23

*Brown v. Bunge Corp.*,
  207 F.3d 776 (5th Cir. 2000) .......................................................................................26

*Brown v. Kinney Shoe Corp.*,
  237 F.3d 556 (5th Cir. 2001) .......................................................................................25

*Burlington N. and Santa Fe Ry. Co. v. White*,
  126 S. Ct. 2405 (2006)..................................................................................................28

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)......................................................................................................22

*Finch v. Texas Health & Human Serv. Comm'n*,
  No. H-13-3716, 2015 WL 5674834 (S.D. Tex. Sept. 25, 2015)...............................29

*Fort Bend Indep. Sch. Dist. v. Williams*,
  No. 01-13-00052-CV, 2013 WL 4779693 (Tex. App.—Houston [1st Dist.]
  Sept. 5, 2013, *no pet.*) .................................................................................................24

*Grice v. FMC Techs., Inc.*,
  216 Fed. Appx. 401 (5th Cir. 2007)............................................................................28

*Haley v. Alliance Compressor LLC*,
  391 F.3d 644 (5th Cir. 2004) .......................................................................................25

*Haskett v. T.S. Dudley Land Co.*,
  3:14-CV-277, 2017 WL 4155413 (S.D. Tex. Sept. 18, 2017)...................................31

*Hinojosa v. CCA Properties of Am., LLC*,
  400 Fed. Appx. 920 (5th Cir. 2010)............................................................................25

*Holtzclaw v. DSC Commc'ns Corp.*,
   255 F.3d 254 (5th Cir. 2001) ..................................................................27

*Jenkins v. City of San Antonio Fire Dep't*,
   784 F.3d 263 (5th Cir. 2015) ..................................................................26

*Johnson v. Select Energy Servs., L.L.C.*,
   No. H-11-3486, 2013 WL 5425115 (S.D. Tex. Sept. 24, 2013).................2

*Juanita Dehart v. Baker Hughes Oilfield Operations, Inc.*,
   214 Fed. Appx. 437 (5th Cir. 2007) .......................................................28

*King v. Louisiana*,
   294 Fed. Appx. 77 (5th Cir. 2008)..........................................................28

*Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*,
   512 F.3d 157 (5th Cir. 2007) ..................................................................24

*Lee v Kansas City Southern Railway Co*,
   574 F3d 253 (5th Cir 2009) ....................................................................26

*Little v. Tex. Dep't of Criminal Justice*,
   148 S.W.3d 374 (Tex. 2004)......................................................................2

*Lyons v. Katy Indep. Sch. Dist.*,
   964 F.3d 298 (5th Cir. 2020) ..................................................................22

*Mack v. John L. Wortham & Son, L.P.*,
   541 Fed. Appx. 348 (5th Cir. 2013).........................................................27

*Maestas v. Apple, Inc.*,
   546 Fed. Appx. 422 (5th Cir. 2013)....................................................23, 29

*Manning v. Chevron Chem. Co.*,
   LLC, 332 F.3d 874 (5th Cir. 2003)..........................................................29

*Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).................................................................................22

*McCoy v. City of Shreveport*,
   492 F.3d 551 (5th Cir. 2007) ..................................................................23

*Microsoft Corp. v. Mercieca*,
   No. 14-15-00024-CV, 2016 WL 4479504 (Tex. App.-Houston [14th Dist.]
   2016, *no pet.*) .........................................................................................25

*Musser v. Paul Quinn Coll.*,
   944 F.3d 557 (5th Cir. 2019) ..................................................................29

*Newbury v. City of Windcrest, Tex.*,
     ___ F.3d ___, 2021 WL 1085811 (5th Cir. Mar. 22, 2021)..............................24, 25

*Patrick v. Ridge*,
     394 F.3d 311 (5th Cir. 2004) ...................................................................................29

*Pegram v. Honeywell, Inc.*,
     361 F.3d 272 (5th Cir. 2004) ...................................................................................24

*Perez v Tex Department of Criminal Justice, Institutional Division*,
     395 F3d 206 (5th Cir 2004) .....................................................................................26

*Peterson v. Bell Helicopter Textron, Inc.*,
     806 F.3d 335 (5th Cir. 2015) ...................................................................................30

*Reynolds v. Sovran Acquisitions, L.P.*,
     2015 WL 6501552 (N.D. Tex. Oct. 27, 2015) ........................................................30

*Simpson v. Iasis Healthcare Corp.*,
     4:19-CV-03140, 2020 WL 5223158 (S.D. Tex. Sept. 1, 2020)...............................26

*Stewart v. Metro. Lloyds Ins. Co. of Tex.*,
     No. H-19-5008, 2020 WL 3452258 (S.D. Tex. June 24, 2020)...............................22

*Stover v. Hattiesburg Pub. Sch. Dist.*,
     549 F.3d 985 (5th Cir. 2008) ...................................................................................26

*Tillman v. S. Wood Preserving of Hattiesburg, Inc.*,
     377 Fed. Appx. 346 (5th Cir. 2010).........................................................................25

*Verma v. Univ. of Pa.*,
     533 F. App'x 115 (3d Cir. 2013)..............................................................................29

*Wallace v. Tex. Tech Univ.*,
     80 F.3d 1042 (5th Cir. 1996) ...................................................................................22

**Statutes**

29 U.S.C. § 623, *et seq*............................................................................................................1

Age Discrimination in Employment Act ....................................................1, 2, 23, 30

Tex. Labor Code § 21.001, *et. seq*. ............................................................................1, 2, 30

Texas Commission on Human Rights Act.................................................................2

**Other Authorities**

Fed. R. Civ. P. 56(a) ..........................................................................................................22

Federal Rule of Civil Procedure 56 .............................................................................22

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID BROD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. NO. 4:20-CV-01854 |
| | § | |
| SPRINT/UNITED MANAGEMENT | § | |
| COMPANT, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT SPRINT/UNITED MANAGEMENT COMPANY'S
MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE CHRISTINA A. BRYAN:

This case is about an employee who, during the last three (3) months of his employment, refused to accept feedback about his performance and instead began looking for work outside of Sprint. Rather than accept the feedback and improve his performance, like his co-workers, Plaintiff David Brod ("Brod" or "Plaintiff") decided to resign, days after receiving his first written warning, to accept another position. For the reasons discussed in this motion, none of the feedback received by Brod had anything to do with his age or any protected activity in which he engaged. Defendant Sprint/United Management Company ("Sprint") respectfully seeks summary judgment on all of Brod's counts and claims.

**I.
SUMMARY OF THE ARGUMENT**

In his Complaint (Dkt. 4), Brod asserts age discrimination and retaliation claims under the Age Discrimination in Employment Act, codified at 29 U.S.C. § 623, *et seq*., and its state law equivalent, Chapter 21 of the Texas Labor Code codified at Tex. Labor Code § 21.001, *et. seq*.

(collectively "ADEA").[1]  Brod, who was 50 years old at the time, alleges that because of his age he received written warnings from his supervisor Rick Urias ("Urias" age 33), allegedly at the direction of Urias' supervisor John Stevens ("Stevens" age 44),[2] during August and October 2018, and was somehow constructively discharged.  Brod also claims he received the October 2018 written warning in retaliation for submitting an internal complaint of age discrimination to Sprint's human resources department before he resigned.

Sprint is entitled to summary judgment on Brod's age discrimination claim because he cannot establish a *prima facie* case of age discrimination.  He was not treated less favorably than similarly situated substantially younger employees.  The written corrective action warnings do not amount to adverse employment actions and he cannot show that his resignation amounts to a constructive discharge.

Even if Brod establishes a *prima facie* case of age discrimination, each of the written warnings he received were the result of legitimate non-discriminatory reasons unrelated to his age and he decided to resign, one month after receiving his first written warning, simply because he disagreed with it.  Brod fails to demonstrate that his age was a "motivating factor" or "but for" cause of any of his written warnings or his resignation.

Similarly, Brod cannot establish a *prima facie* case of retaliation because the corrective actions do not amount to adverse employment actions and, in any event, there is no causal connection between such warnings and his internal complaint to Sprint's human resources department.  The decision makers Brod points to—Urias and Stevens—were unaware that Brod

---

[1] Although the Texas Commission on Human Rights was abolished in 2004, *Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 377 (Tex. 2004), some courts still refer to Chapter 21 of the Texas Labor Code as the Texas Commission on Human Rights Act (or "TCHRA").  *Johnson v. Select Energy Servs., L.L.C.*, No. H-11-3486, 2013 WL 5425115, at *1 (S.D. Tex. Sept. 24, 2013).
[2] The witnesses' ages at the time of the events are reflected herein.

alleged in his Ethics complaint that Urias and Stevens discriminated against him because of his age before deciding to issue the August and October 2018 written warnings.  Brod also cannot rely on his resignation to satisfy the adverse employment action element because he was not constructively discharged.

However, even if Brod established a *prima facie* case of retaliation, he received the written warnings for legitimate business reasons unrelated to his internal complaint to Sprint's human resources department—i.e., his ongoing failure to improve his performance—and fails to demonstrate that "but for" his internal complaint of age discrimination, he would not have received any of the written warnings or resigned.  Brod's performance challenges originated well before his August 14, 2018 internal complaint and well before Urias' continued efforts to improve Brod's performance.  Brod simply offers nothing more than his unsupported assertions and subjective beliefs, which are insufficient to survive summary judgment.  For these reasons, and as further detailed below, Sprint is entitled to summary judgment.

## II.
## NATURE AND CURRENT STAGE OF THE PROCEEDING

Brod filed his Original Complaint on May 28, 2020 against Sprint Corporation.  (Dkt. 1). On June 18, 2020, Brod amended his complaint to include Sprint/United Management Company. (Dkt. 4).  On, August 7, 2020, Brod, by stipulation, dismissed Sprint Corporation.  (Dkt. 6).  The parties have completed discovery, and Sprint now requests complete summary judgment dismissal of Brod's claims.  The parties' joint pretrial order is due July 16, 2021, and docket call is set for July 30, 2021 at 10:00 a.m.

## III.
## INCORPORATION OF APPENDIX

Sprint incorporates by reference the Appendix of Summary Judgment Evidence attached to this motion.

# IV.
## PERTINENT UNDISPUTED FACTS

**A.      Introduction.**

Until its merger with T-Mobile in April 2020, Sprint was the fourth-largest wireless carrier in the United States offering a range of wireless and wireline voice and data products and services, as well as devices and accessories, to residential and business customers in the United States, Puerto Rico, and the U.S. Virgin Islands.[3]   The pertinent events giving rise to this lawsuit occurred before the merger, and specifically during the time Brod reported to Urias.

**B.      Sprint's Relevant Policies**

During the relevant time period, Sprint  had several employment policies governing equal employment opportunity, corrective action and internal appeal options that  were "in play": (1) Sprint's Equal Employment Opportunity Policy; (2) Sprint's Corrective Action Policy; and (3) Sprint's "Open Door" Policy and ADR Process.  Each policy is discussed below in connection with Brod's claims.

### 1.      Sprint's Equal Employment Opportunity Policy

Sprint was an equal opportunity employer and adhered to a policy prohibiting unlawful discrimination against its employees because of any protected basis, including, but not limited to age. Ex. E (Cox. Decl.), at Ex. 1.  Employees subjected to or observing discrimination are directed to report the circumstances to a manager, human resources, or call the company's Ethics Helpline. Ex. E (Cox. Decl.), at Ex. 1.  Complaints can be anonymous and, regardless of the form, Sprint prohibits retaliation.     Ex. E (Cox. Decl.), at Ex. 1.   Sprint's human resources department investigates reported complaints of discrimination and retaliation. Ex. E (Cox. Decl.), at Ex. 1.

---

[3] *See* Federal Communications Commission, *Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification*, FCC 19-03, In the Matter of Applications of T-Mobile US, Inc., and Sprint Corporation (Nov. 5, 2019), at 7, *available at* https://docs.fcc.gov/public/attachments/FCC-19-103A1.pdf

## 2.  Sprint's Corrective Action Policy

Sprint's corrective action process was implemented to enable managers to address employee underperformance or misconduct.  Ex. C (McCarter Dep.), at 80:12-84:15, Ex. 4; Ex. E (Cox. Decl.), at Ex. 2. Although the policy identifies corrective action stages—coaching/verbal warnings, written warnings, and final written warnings—the policy clearly provides that managers have "***sole discretion . . . to defer an employee's entry into, or omit progression levels of, the corrective action process***."  Ex. C (McCarter Dep.), at 80:12-84:15, Ex. 4; Ex. D (Urias Dep.), at 75:9-76:10, Ex. 5; Ex. E (Cox. Decl.), at Ex. 2.      In other words, a manager can issue a final written warning or terminate an employee without first providing a verbal warning or written warning. Ex. C (McCarter Dep.), at 80:12-84:15, Ex. 4; Ex. D (Urias Dep.), at 75:9-76:10, Ex. 5; Ex. E (Cox. Decl.), at Ex. 2.

## 3.  Sprint's Open-Door and ADR Process

Sprint also implemented an Open-Door Process which encouraged employees to voice any work-related issues, such as a disagreement with a corrective action, to the employee's direct supervisor or anyone in their management chain, human resources, or the Ethics Helpline. Ex. E (Cox. Decl.), at Ex. 3.   If an employee believes his concerns are not resolved through the Open-Door Process, the employee is permitted to appeal and initiate the Alternative Dispute Resolution ("ADR") process.[4] Ex. E (Cox. Decl.), at Ex. 4.     The ADR process allows review of various employment decisions, including review of corrective actions not satisfactorily addressed during the Open-Door process.  Ex. E (Cox. Decl.), at Ex. 4. An employee can also challenge his termination through the ADR process.  Ex. E (Cox. Decl.), at Ex. 4.

Through ADR, an employee's concern can be further reviewed by a panel consisting of

---

[4] In the fall of 2018, Sprint changed the name of this process to the Concern Assessment Program (CAP).

two individual contributors and one member of management, or through an Individual Management Review ("IMR") by a director or above, outside of the employee's immediate reporting chain.  Ex. E (Cox. Decl.), at Ex. 4.  The IMR makes a finding based on its review of relevant documents, and interviews of the employee, the employee's management, and witnesses.  Ex. E (Cox. Decl.), at Ex. 4. The IMR may grant or deny the relief requested by the employee, or modify the decision where appropriate.  Ex. E (Cox. Decl.), at Ex. 4.

### C.    Pertinent Events During Brod's Employment with Sprint

Brod worked for Sprint as a District Manager in Houston from February 9, 2015 until November 2, 2018.  Ex. A (Brod Dep.), at 49:19-25, 99:6-15.  As a District Manager, Brod was responsible for providing excellent customer satisfaction, and actively managing and driving his store managers' marketing and sales behaviors to meet or exceed sales goals and performance metrics. Ex. A (Brod Dep.), at  125:18—129:4; Ex. D (Urias Dep. at 39:21—40:6, 57:5—12,); Ex. E (Cox. Decl.) at Ex. 5.  In order to drive store manager behaviors, Brod, as a district manager, was required to personally inspect stores withing his district and actively coach store managers to ensure they are focusing on appropriate sales behaviors that drive the performance metrics related to selling Sprint's services, phones and related devices.  Ex. D (Urias Dep.), at 24:23—25:25; Ex. E (Cox. Decl.) at Ex. 5.  District managers, like Brod, were ranked against other district managers nationwide based on their individual performance.  Ex. D (Urias Dep.) at 29:6-30:20, Ex. 1.

At his deposition, Stevens recalled the Houston market was underperforming for some time before Brod commenced his employment.  Ex. B (Stevens Dep.) at27:20-28:21.  Once Brod commenced his employment, the Houston market's performance did not really change.  And, while Brod enjoyed some success, Stevens, Dawn McCarter ("McCarter" age 51) and Urias observed several deficiencies in his performance which, over time, did not improve.

### 1.    John Stevens' Observations of Brod's Performance.

Brod initially reported to Director of Retail Sales Art Pennington, who reported to Stevens, the Regional Vice-President of Retail Sales at the time. Ex. A (Brod Dep. at 100:1-4; Ex. B (Stevens Dep. 25:18-24, 27:10-19).  After the departure of Mr. Pennington in late February 2017, Brod reported directly to Stevens until the new director, McCarter was assigned to manage the Houston market in May 2017. Ex. A (Brod Dep.  102:16-24).  During this period, Stevens had his first experience with Brod.

At his deposition, Stevens recalled Brod, against the company's direction, failed to move his market managers to retail store managers and, instead, assigned them to Radio Shack kiosks resulting in Brod's district being 25% overbudget.  Ex. B (Dep). at 22:22-24:16).   According to Stevens, Brod was "the highest offender in terms of labor overages" as a result of his decision.  *Id.* Stevens discussed the labor overage issue with Brod telling him he was "way out of bounds in labor" and asked, "what's going on?" and to "walk him through" what happened.  *Id.*

### 2.    Dawn McCarter's Observations of Brod's Performance.

In May 2017, McCarter, who was 53 years old, assumed responsibility for the Houston market and Brod began reporting to her.  Ex. C (McCarter Dep. 15:9—19; 6:10-12).[5]; Ex. E (Cox. Decl. at ¶ 35).  McCarter's direct reports at the time included Brod (age 49), Jeff Luedecke (age 41), Jason Hanke (age 35), Blake Lewis (age 35), Mike Keller (age 39), Al Sunday (age 62), and Ernie Douglas (age 56). Ex. C  (McCarter Dep.) at 20:12-25, 21:7-10); Ex. E (Cox. Decl. at ¶ 35).

In an effort to provide McCarter with feedback on the relevant market and district managers under her supervision, including performance challenges and opportunities, Stevens informed

---

[5] McCarter transitioned from another role within Sprint to the Director or Retails Sales position covering Brod's region.  Ex. C (McCarter Dep.) at 69:2—12.  McCarter previously worked with Brod at Radio Shack and recommended him for employment with Sprint in 2015.  Ex. C (McCarter Dep.) at 16:13-18:2.

McCarter that he was disappointed in the performance of the Houston market and had been for some time. Ex. C (McCarter Dep.) at 41:2-12; Ex. B (Stevens Dep.) at 25:18-27:9.

Shortly after assuming responsibility over the Houston market, McCarter shared some of Steven's feedback with Brod explaining he was disappointed with the Houston market. Ex. C McCarter Dep.) at 47:23-48:6. McCarter told Brod that now that she was coming into the role, Brod needed to urgently improve his performance. Ex. C (McCarter Dep.) at 46:10-19. Brod, according to McCarter, was a mediocre performer who "would argue that his performance hadn't been terrible over time, and that [Stevens' feedback] wasn't a fair assessment." Ex. C (McCarter Dep.) at 48:7—12.

McCarter did not perceive Stevens' feedback to be based on age, whether Brod's age or the age of other district managers, and she never perceived or heard of any ageist remarks by Stevens. Ex. C (McCarter Dep.) at 48:20-49:13.   In fact, McCarter also recalled during her deposition that Stevens communicated similar concerns to her about the performance of Jeff Luedecke (age 41), a substantially younger employee. Ex. C (McCarter Dep.) at 48:20-49:13; Ex. B (Stevens Dep.) at 30:7-31:2.   Stevens, during his deposition, also recalled discussing with McCarter that Luedecke had been successful in his prior role as Indirect Sales Manager, but was struggling in his new role as District Manager under McCarter and that they discussed "trying to figure out what to do with Jeff." Ex. B  (Stevens Dep.) at 30:7-31:2.

### 3.    Urias' Observations of Brod's Performance from April to August 2018.

On or about April 1, 2018, after a restructuring of Stevens' region, Brod began reporting to Urias, Director of Retail Sales. Ex. A (Brod Dep.) at 119:10-14. Urias, like McCarter, reported

to Stevens.[6]  Ex. D (Urias Dep.) at 64:7-23.  Before taking over the Houston market, Urias met

with Stevens to discuss its performance including the district managers. Ex. D (Urias Dep.) at

64:18—23.[7]  The district managers reporting to Urias were:[8]

| Name | Age |
|---|---|
| David Brod | 50 |
| Duana Jordan | 46 |
| Josh Mamer | 39 |
| Matthew Lewallen | 44 |
| Albert Sunday | 62 |
| Vincent Senter | 51 |
| Marsha Huskey | 53 |
| Sergio Velasquez | 33 |
| Mike Keller | 39 |

**a.      Urias' July 5, 2018 Email to Brod Regarding His Performance**.

Urias first met with Brod and the other district managers when he assumed management of

the Houston market in April 2018. Ex. D (Urias Dep.) at 69:22—70:13.  After an opportunity to

observe performance, Urias emailed his district managers in July 2018 highlighting areas in which

their performance needed improvement based on the April through June 2018 period.  Ex. E (Cox.

Decl.) at Exs. 6, 12-13.D (Urias Dep.) at 22:23—23:17.

In his July 5, 2018 verbal warning email to Brod, Urias highlighted several behaviors

expected of Brod and a downward trend in two important performance metrics:  Accessories Per

---

[6] McCarter continued to report to Stevens when Urias assumed responsibility over the Houston market. but, as part of the restructuring, was assigned to manage different markets within Stevens' region.  Ex. C (McCarter Dep.) at 69:2—12.

[7] Urias also had a similar discussion with McCarter but, during his deposition, did not remember specifically what they discussed.  Ex. D_(Urias Dep.) at 64:10—17.  Details of Urias's transition discussion with McCarter is discussed fully in Section IV.C.4.

[8] Neither Urias, McCarter nor Stevens knew the ages of his district managers.  *See, e.g.,* Ex. D (Urias Dep.) at 92:25-93:13; Ex. C (McCarter Dep.) at 19:18-20:5; Ex. B (Stevens Dep.) at _56:15-57:13.  The ages of the district managers were verified by Human Resources Business Partner Steven Cox from Sprint personnel records or data identifying their dates of birth.  Ex. E (Cox. Decl.) at ¶ 35.

Handset ("APH") and Total Equipment Protection ("TEP").  Ex. D (Urias Dep.) at 29:6—31:14,

Ex. 1; Ex. A (Brod Dep.) at 121:17—20, Ex. 13).  Urias wrote, in relevant part:

> During Q118 there has been a struggle with getting your district to perform the company expectations and the below shown controllable metrics.  We have discussed strategies and different levels of performance management though there seems to be slower movement than expected in performance.
>
> As you can see below, there is a concerning trend in these main metrics in your April to June results beating you [. . .] downward. The gap between these results and our targets is greatly impacting the region's ability to keep to our commitments to the enterprise. We need to get this fixed asap.
>                 …
> In order to further improve on these numbers, we will do the following:
>
> > •   I will be scheduling a weekly 1-1 with you to go over your strategy and progress on each metric
> >
> > •   You will reach out to the top performers in each metric both inside the region and in the Enterprise and utilize this feedback to formulate a strategy you will implement.
> >
> > •   You will monitor the quantity and quality of the coachings done in each of her locations with a clear focus on the "three strike" rule on observed behaviors.  (Management needs to be 100% versed in setting expectations and following up with coaching)
> >
> > •   You will ensure there is floor leadership and manager involvement in transactions in your sales floors
> >
> > •   You will follow up with accountability for employees who did not follow your direction and lack in performance
> >
> > •   You will prioritize visibility and presence in stores with the biggest opportunities and concentrate your immersion visits there.
>
> I expect for you to address your team and see upward movement prior to the end of the month with considerable improvement in July.

> Please follow up with your plan of action for each of these metrics
> for further discussion with me on our 1-1.

Ex. E (Cox. Decl.) at Ex. 7.  At his deposition, Brod admitted Urias' July 5, 2018 email "focuse[d] on two areas of opportunity from a performance standpoint." Ex. A (Brod Dep.) at 121:12-20, Ex. 13.  Brod also admitted the other district managers reporting to Urias received a similar email.  Ex. A (Brod Dep.)  at 121:17—122:11, Ex. 13; .  For example, Urias sent a similar email to Josh Mamer (age 39) outlining a similar downward trend in his APH and TEP performance metrics telling Mamer, as he told Brod, "we need to get this fixed asap."  Ex. E (Cox. Decl.) at Ex.12. Unfortunately, Urias did not observe improvement in Brod's performance.  Ex. D (Urias Dep.) at 24:23-25:15).

### b.      Urias' August 14, 2018 Written Warning.

After sending his July 2018 email, Urias visited Brod's stores and "saw a complete disregard of "the performance expectations highlighted in his July 5, 2018 email.  Ex. D (Urias Dep.) at 24:23-25:15).  Urias, at his deposition, further noted Brod "wasn't inspecting anything that I asked him to" in the July 2018 verbal warning, "even when he actually visited a store." Ex. D (Urias Dep.) at 24:23—25:15).  In addition to his visual inspections of Brod's stores, Urias solicited feedback from Brod's store managers and employees.  Ex. D (Urias Dep.) at 24:23—25:25.  Urias, based on his observations and store feedback, believed Brod was not "following the direction, . . . the coaching . . . and . . . the action plan that was outlined" in the July 5, 2018 verbal warning.  Ex. D (Urias Dep.) at 24:23-25:15. As a result, in August of 2018, Urias consulted with Human Resources Business Partner John Pedro, to discuss further corrective action for Brod.  Ex. D (Urias Dep.) at 98:10-14.  After such consultation, Urias decided to give Brod a Final Written Warning.  Ex. D (Urias Dep.) at 76:14-16.

Accordingly, on August 14, 2018, Urias issued Brod a Final Written Warning which states, in part:

> David has struggled to maintain performance and result leading behaviors in his district.   This stems from lack of efficient inspection, time management and planning, as well as lackluster sense of urgency in acting to very urgent asks and requests.   This has accumulated to becoming an issue where most of his doors are underperforming on our new scorecard.   The issues outlined in the last set of documentation were TEP, APH, and None-HS attach percentage.   All of these are metrics in our new scorecard with TEP and metrics spiked for the month (still under target) following the last documentation, the lack of follow-up and focus on behaviors has made the spike unsustainable putting David's district in an outlying position regarding his results…
>
> The metric output is a direct reflection of David's inspection process while doing store visits or a result of the lack of attention put into some of his underperforming doors.   There is a clear expectation of certain behaviors that translate into good performance.   These can be summarized into Knowledge, Execution of initiatives and Inspection of expectations.   I will outline the issues that have failed to meet the standards of these expectations below…

The document then goes on to list specific observations of issues Mr. Urias saw at Mr. Brod's stores, the first five of which occurred in August of 2018.   The last point stating:

> Before these latest incidents there has been a pattern of lack of inspection, clear communication, effective decision-making, and accountability on behalf of David towards his district.   These include approving the SM of store 1747 to move an ASM to a sales role in order to "show the other reps what can be done" and having the ASM ring up sales under their own name while RCs were available.   Store 1582 which had only been opened a few months having severe unaddressed issues with facility items and, in a time where exposure should be the focus of the store, all marketing items were being removed from the front of the store at peak traffic times. David also decided to open store 1504 before their scheduled open time causing multiple commission issues which left the employees of the store without commissions for over a month.   To resolve this David was asked to open commission tickets which were not opened for multiple weeks after the discussion.   We also had HR escalations during the month of July th[at] required David to make a decision on the best action for us to take with the affected employees.   Both times David stood back and requested me and HR to decide.   The

> second issue involved a video of a SM pushing a customer outside
> of the store.  Though the aggression was clear, David insisted that
> after speaking with the people that were there at the time he though
> [sic] the push was an accident.  The lack of clear judgment in making
> a decision here creates the possibility of future liability for the
> company and issues where David has to be engaged in making the
> best decision as a leader for Sprint.

Ex. E (Cox. Decl.) at Ex. 7. .  As he did in the July 5, 2018 verbal warning email, Urias set forth a

bullet point list of action items for Brod to follow up on to improve his performance.  Ex. E (Cox.

Decl.) at Ex. 7. Brod, however, did not accept Urias' feedback constructively.

### 4.     Investigation of Brod's August 15, 2018 Ethics Complaint

On August 15, 2018, the day after he received the August 2018 written warning, Brod

submitted a complaint to Sprint's Ethics Helpline alleging age discrimination. Ex. A (Brod Dep.)

at 163:14-164:3, Ex. 18; Ex. E (Cox Decl.) ¶¶ 9-10.  Brod summarized his complaint as follows:

- Stevens directed that older employees be terminated, including DMs Albert Sunday, Ernie Douglas, and Brod.
- Urias had not given him any previous performance coaching, written or verbal, or any indication that he was displeased with Brod's performance [before the August __, 2018 written warning].
- On the same evening Brod received the final written warning from Urias, Stevens sent an email to all district managers in which he made statements related to Brod's age.
- Stevens made comments like "RadioShack is old school," "People at RadioShack don't transition to Sprint" and RadioShack people are an "older generation."

Ex. A (Brod Dep.) at 163:14-164:3, Ex. 18.  Brod also requested a review of the August 14, 2018

written warning pursuant to Sprint's Open-Door/ADR process. Ex. A (Brod Dep.) at 163:10-13;

Ex. E (Cox Decl.) ¶¶ 9-10.

The Ethics Helpline complaint was sent to Human Resources Business Partner Steve Cox

for investigation of  Brod's age discrimination ethics complaint before proceeding with his Open-

Door appeal through Sprint's ADR process because any finding upholding Brod's complaint

would automatically reverse the final written warning.  Ex. E (Cox Decl.) ¶¶ 9-10.  As part of his

investigation, Cox interviewed Brod, Stevens, McCarter and Urias. Ex. E (Cox Decl.) ¶¶ 11-17,

Ex. 8. Salient points from those interviews are highlighted below.

> ### a.    Brod's Interview

Cox interviewed Brod on August 20, 2018.   Ex. E (Cox Decl.) ¶¶ 11-16, Ex. 8.   Cox

reported that during his interview, Brod added additional information about his claims, as follows:

- [Y]ounger DMs were given more attention on area calls.   When asked to be specific about which DMs he was referring to, Brod offered a list of four other DMs who were 40 and older.

- [Brod] had confronted Stevens in March of 2018 regarding Stevens' alleged direction to terminate him. Stevens denied any intention to fire him, but instead focused on the need for Mr. Brod to improve his performance.  Specifically, Brod stated, "[Stevens] denied any desire to terminate me and indicated he has no such agenda.  While this did not reconcile what I have been told from several sources close to John, I politely received his response and we had a conversation about my ongoing career, focused on the need for stronger performance."

- Additional employees told Brod Stevens intended to fire him, including former Director Art Pennington, HRBP Penny Carroll, McCarter and Sunday.

- Regarding Stevens' email Brod believes referenced his age, the statements with which Brod was concerned included, "Years of experience don't always translate into best practices" and "Todays problems demand new skills and many of our partners haven't fully developed these new skills even though we have great tenure in our management ranks."

Ex. E (Cox Decl.) ¶¶ 11-16, Ex. 8. Cox recalls forming the impression, based on his

interview, that Brod was really complaining about Stevens, rather than Urias.  Ex. E (Cox Decl.)

¶¶ 11-16, 28, Ex. 8.

> ### b.    Urias' Interview

In his August 22, 2018 interview with Cox, Urias confirmed, in connection with his

assuming leadership over the Houston market, that he and McCarter "did a typical review of talent

. . . like any transition" and discussed the Houston market's ongoing underperformance challenges

and the need to increase "performance and show growth." Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24, 28,

-14-

Ex. 8. When asked to discuss any information he received from McCarter about Brod as part of the transition, Urias reportedly explained "Brod had been underperforming for a while before [McCarter] took over" and was "slow to adapt and drive change in his stores and lacked a self-awareness of his opportunities." Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24, 28, Ex. 8.

When asked by Cox whether Stevens gave him any feedback about the Houston market, Urias reportedly explained Stevens told him "[g]et sales and grow the market." Ex. E (Cox Decl.) ¶¶ 11, 18-19,28, Ex. 8. Urias denied that Stevens directed him to on how to address "individual performance" of any one district manager. *Id.*

Urias, characterized Brod's performance over the previous four months as "struggling to maintain a consistent level of performance and drive change," that Brod failed to inspect and stay involved with his store managers and did not "understand focus areas and strategies to improve." Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24, 28, Ex. 8. Urias stated Brod's performance was driven by one or two large volume stores. *Id*.

When asked by Cox if he previously provided Brod any documented coaching or "corrective action[s]," Urias replied that he coached Urias during one-on-one discussions and during store visits regarding the "influence he has on stores through conversations and inspections." Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24, 28, Ex. 8. During his one-on-one meetings with his district managers, including Brod, Urias discussed "what is working and what is not," would identify "struggles [and] actions plans" and review sales metrics, underperforming stores, and "follow up inspection plans." Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24,28, Ex. 8. Urias also explained he emailed Brod in July 2018 "documenting [Brod's] performance with specific action items." Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24, 28, Ex. 8.

Urias reported to Cox that he issued corrective actions to other district managers such as: Vincent Senter (age 51), Josh Mamer (age 39), and Marsha Huskey (age 53).  Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24, 28, 34-35,  Ex. 8, Exs. 13-17.  Urias told Cox he gave Urias a final written warning on August 14, 2028 because "of the miss in every one of the stores visited after having expectations set the previous week."  Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24, 28, 35, Ex. 8.  Cox and Urias discussed other aspects of Urias's performance as noted in the August 14, 2028 written warning. Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24, 28, Ex. 8.

Finally, Urias and Cox discussed Stevens' August 14, 2018 "Truths of Multi-Unit Management" email.   Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24, 28, Ex. 8..  Urias put the email into proper context stating that during the last three (3) months, "there had been a tremendous amount of change in the company, . . . and the *region* has been slow to adapt and change[,] . . . and that "we need to be flexible to understand new things and needed heavy inspections to ensure understanding [to] drive change."  *Id.*  Urias denied hearing anyone refer to employees from Radio Shack as "old school" or "older generation" and told Cox that he "came from Radio Shack and there have been many good employees come from Radio Shack."  *Id.*

### c.    McCarter's Interview

During her August 24, 2018 interview, McCarter confirmed the Houston market had not been doing well "for a while" and that Stevens "had long had a concern about the performance of the Houston market." Ex. E (Cox Decl.) ¶¶ 11, 17, 20-21, 28, Ex. 8.    McCarter referenced an earlier "Operations Review" meeting in January 2017, when she worked in a different role within Steven's region, where Stevens "came down hard on the Houston" district managers for their performance.  *Id.*  McCarter noted Brod was present during the meeting but was not the "target of the criticism."  *Id.*

McCarter described Brod as an "average performer" who was "reluctant to address outlier performance and needed to adapt to change faster." Ex. E (Cox Decl.) ¶¶ 11, 17, 20-21, 28, Ex. 8. According to McCarter, the performance of Brod's stores "needed to improve."  Ex. E (Cox Decl.) ¶¶ 11, 17, 20-21, 28, Ex. 8.   When McCarter tried to address Brod's performance, "he would point out that he was doing better than others that were also underperforming."  Ex. E (Cox Decl.) ¶¶ 11, 17, 20-21, 28, Ex. 8.   In January or February 2018, McCarter recalled she "had a conversation with [Brod] about urgency in showing improvement." Ex. E (Cox Decl.) ¶¶ 11, 17, 20-21, 28, Ex. 8.

When asked by Cox whether Stevens provided "any feedback or direction on corrective action specific to individuals" McCarter explained they had "conversations about all" district managers. Ex. E (Cox Decl.) ¶¶ 11, 17, 20-21, 28, Ex. 8.

### d.   Stevens' Interview

Cox interviewed Stevens on August 24, 2018.  Ex. E (Cox Decl.) ¶¶ 11, 17-19, 28, Ex. 8. When asked about the Houston market, Stevens stated that during "[t]he last 5-6 years, the Houston market has struggled" in a number of areas such as staffing, execution and sales and that such challenges were "tied back to leadership issues."  *Id*.  Stevens denied instructing Urias or McCarter to terminate anyone but explained to Cox that he informed McCarter and Urias that that the Houston market had three district managers "in the bottom 5 of the region" and that he expected to see improvement, or we need to make changes."  *Id.*  Stevens told Cox that whenever McCarter discussed her concerns about the performance of her district managers, he told her "she needed to hold the district managers accountable" *Id*.  When Urias expressed to Stevens his frustration with Brod's performance, Stevens would ask "what level of Corrective Action have you taken" and that he would encourage Urias to "partner with HR."  *Id.*

Stevens denied making any age-related comments including the "Radio Shack" comments Brod attributed to him. Ex. E (Cox Decl.) ¶¶ 11, 17-19, 28, Ex. 8. Stevens explained his August 14, 2018 email was intended to address the change in the organization from more utility-centric to retail-centric, and was intended to convey to employees that they will need to take a different approach based on the change in the company, and cannot rely on their previous methods in the new organization . Ex. B (Stevens Dep.) 71: 16-72:4; Ex. E (Cox Decl.) ¶¶ 11, 17-19, 28, Ex. 8. Stevens told Cox, in reference to the August 14, 2018 email, "[w]e have struggled over the last year in keeping the [district managers] focused on their key responsibilities." Ex. E (Cox Decl.) ¶¶ 11, 17-19, 28, Ex. 8. The email was sent to all district managers and not targeted specifically for Brod or any specific employee. Ex. B (Stevens Dep.) 71: 16-72:4.

### e.     Cox's Findings

After reviewing information from the foregoing interviews and relevant documents, Cox, on or about September 4, 2018, determined Brod's allegations could not be unsubstantiated. Ex. E, Cox. Decl., ¶ 25). Cox specifically determined that Stevens did not instruct McCarter or Urias to terminate anyone including Brod. Ex. E, Cox. Decl., at Ex. 8. Cox determined all three district managers that managed the Houston market were underperforming relative to the rest of the region and that the Houston market overall had been underperforming for "a number of years." *Id.* No one corroborated Brod's allegations about age-based comments by Stevens or perceived Stevens' August 14, 2018 email to be age-related. *Id.* Brod's allegations about an email to all District Managers referencing him specifically was also not substantiated. *Id.* . Cox was also unable to substantiate that the "RadioShack is old school," "People at RadioShack don't transition to Sprint" and RadioShack people are "older generation," statements were made. *Id.*

### 5.     Stevens Changes August 14, 2018 Warning from "Final" to "Written."

After Cox's investigation, Brod proceeded with his Open-Door/ADR objection to the

August 14, 2018 final written warning.  Ex. E, Cox. Decl. at ¶ 29 and Ex. 9. As part of that process, Stevens reviewed Brod's objection and consulted with Human Resources Business Partner Andrea Nelson.  *Id* and Ex. B, Stevens' Dep. at 51:6—53:2.  Ultimately, during September 2018, Stevens reduced the August 14, 2018 written warning from a "final back to a written." *Id.*   At his deposition, Stevens explained that while Urias followed and "met all requirement needed" in issuing the August 14, 2018 final written warning, he decided to give Brod, who claimed he did not know he received a prior warning (i.e., the July 5, 2018 email from Urias), the "benefit of the doubt."  Ex. B, Stevens' Dep. at 51:6—53:2.

> **6.      Urias' October 10, 2018 Written Warning.**

During the months of August and September 2018, Urias continued to observe the same deficiencies in Brod's performance previously noted.  Ex. D (Urias Dep.) at 84:21—86:11, 86:22—87:12.  Though Brod's August 2018 performance warranted further corrective action, Urias decided to hold off on issuing corrective action since Brod's challenge of the August 14, 2018 warning was still pending.  Ex. D (Urias Dep.) at 86:21—87:12; 100:10—100:20; Ex. E (Cox. Decl.) at ¶ 30, Ex. 10. Instead, Urias addressed Brod's September 2018 performance noting, the "lack of execution on the behaviors [noted in] the last corrective action."  Ex. D (Urias Dep.) at 86:21—87:12; 100:10—100:20; Ex. E (Cox. Decl.) at ¶ 30, Ex. 10.  As a result, Urias gave Brod a final written warning on October 10, 2018, which states, in relevant part:

> David finished the month of September in the fourth quartile for the branded scorecard metrics.  Key metric underperformance continues to be an issue in this district and needs to be addressed through detailed and thorough disciplined follow-through of the action plan, coaching leadership, quality immersion visits, and following the performance management process closely.
>           …
>
> The consistent underperformance of this district with no change to the expectations set surrounding coaching, rep knowledge, sales floor execution, and DM visits to and the inspection creates a

-19-

performance situation warranting of this corrective action.

Ex. E (Cox. Decl.) at Ex. 10.

### 7. Brod's IMR Review.

Brod remained unhappy with Stevens' decision to reduce the August 14, 2018 final warning to a written warning; he wanted it reduced to a verbal warning.  Ex. E (Cox Decl.) at ¶ 29, Ex. 10.   Brod also objected to the October 2018 final warning.  Ex. E (Cox Decl.) at ¶ 31, Ex. 10. Consequently, Brod sought further IMR review.  *Id.*

On or about October 1, 2018, Human Resources Business Partner Candace Lyle ("Lyle") lead the IMR review of Brod's warnings.[9]  Ex. E (Cox Decl.) at ¶¶ 29, 31, Exs. 10-11. The IMR was a Director from outside of Stevens region or supervision.   After reviewing the facts and relevant documents, the IMR determined there was "no proof of [Brod] being treated inconsistent with company policy or practice."  Ex. E (Cox Decl.) at ¶ 31, Ex. 11.

### 8. Urias' Performance Management of Other District Managers

Urias issued written corrective actions to other district managers, regardless of age.  In addition to emailing all district managers in July 2018 regarding their April through June 2018 performance, Urias issued written corrective actions to Josh Mamer (age 39) on September 9, 2018; Vincent Senter (age 51) on September 9, 2018; and Matthew Lewallaen (age 44) on June 13, 2019.  Ex. D (Urias Dep.) at 19:16—25; 20:10—23:6; 90:23—93:13; Ex. E (Cox. Decl. at ¶35). Urias recalled giving Mamer a final written warning before Brod resigned.  *Id*. He also issued a corrective action to Sergio Valasquez (age 34).  *Id*.   Urias explained during his deposition that Senter, Mamer and Taylor all improved their performance after receiving corrective actions.  *Id.*

---

[9] While the IMR review of the August 14, 2018 warning was ongoing, Brod alerted Sprint's Human Resource's department of the October 10, 2018 final warning.  Ex. E (Cox Decl.) at ¶¶ 29, 31, Ex. 10.  As a result, both the August and October 2018 warnings were reviewed during the IMR process. *Id*.

Urias also recalled issuing final written warnings to district managers Sherry Edwards, Matt Taylor (age 33), and Denise Chandler (age __). Ex. D, Urias Dep. at 17:13—18:7. Urias was pleased with, and did not issue written corrective actions regarding, the performance of, Duana Jordan (age 46), and Albert Sunday (age 62).   *See Id*.

### 9.   Brod's Resignation

October 19, 2018, Brod resigned by email designating November 2, 2018 as his last day. Ex. A (Brod Dep_.) at 209:25-211:10.  Notably, Brod had begun searching for employment elsewhere months before resigning, and months before receiving the October 10, 2018 final warning. Ex. A  (Brod Dep.). at 205:16-23.

Days after receiving the first warning on August 14, 2018 and before receiving the October 10, 2018 final warning, Brod applied for four (4) jobs.  On August 18, 2018, Brod applied for employment with GNC.  Ex. A (Brod Dep.) at 205:16-23.  On September 8, 2018, Brod applied for employment with Mobilelink.  Ex. A  (Brod Dep.). at 205:16-23.  On September 11, 2018, Brod applied for employment with Extra Space Storage.  Ex. A at (Brod Dep.) at 205:16-23.  On September 20, 2018, Brod applied for another position with Game Stop.  Ex. A at (Brod Dep.) at 205:16-23.  All of Brod's foregoing efforts to obtain another job occurred before his second written warning on October 10, 2018.

In mid-September 2018, Brod interviewed with Mobilelink.  Ex. A (Brod Dep.) at 205:16-23.  On October 8, 2018, before his second final written warning, and before the internal processes were exhausted, Brod received an offer of employment with a designated start date of October 27, 2018.  Ex. A (Brod Dep.) at 209:2-8.[10]

---

[10] Brod testified at his deposition that he started employment right away after his resignation and there was no period of time in which he was unemployed after such resignation. Ex. A(Brod Dep.). at 40:21—41:2.

# V.
## ARGUMENTS AND AUTHORITIES

## A.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, a court may grant a motion for summary judgment if all of the information before the court shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a defendant moves for summary judgment on a plaintiff's causes of action, it need only point to the absence of evidence supporting one or more elements of her claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301-02 (5th Cir. 2020). The moving party "need not *negate* the elements of the nonmovant's case." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (emphasis in original); *Stewart v. Metro. Lloyds Ins. Co. of Tex.*, No. H-19-5008, 2020 WL 3452258, at *3 (S.D. Tex. June 24, 2020).

Once the movant meets its burden of showing no genuine dispute of material fact exists, the burden shifts to the non-movant to prove with affirmative evidence "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). To meet this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the non-movant must provide significant probative evidence that would enable a jury to return a verdict in the non-movant's favor. *Anderson*, 477 U.S. at 256-57. As discussed below, Sprint is entitled to summary judgment on Brod's claims.

## B.    Plaintiff's Age Discrimination and Retaliation Claims Fail as a Matter of Law.

As previously summarized, Brod alleges Sprint discriminated against him based on his age by giving him corrective action warnings culminating in his constructive discharge. As a matter

of law, Brod's claims cannot survive summary judgment.

### 1. Plaintiff Cannot Establish the *Prima Facie* Elements of His Age Discrimination Claims.

In order to succeed on his age discrimination claims, Brod must prove he was: (1) a member of a protected class; (2) qualified for the position held; (3) subjected to an adverse employment action; and (4) treated less favorably than a similarly situated younger employee. *See Maestas v. Apple, Inc.*, 546 Fed. Appx. 422, 426 (5th Cir. 2013) (affirming summary judgment on age discrimination claims under ADEA and TCHRA).[11]  Assuming Brod is able to establish elements (1) and (2), he fails to satisfy elements (3) and (4).

### a. The Corrective Actions Are Not Adverse Employment Actions.

Brod cannot rely on the corrective actions he received to support his age discrimination claim because such decisions are not, as a matter of law, adverse employment actions.  Actionable "[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 559-60 (5th Cir. 2007) (quotation omitted).  Adverse employment decisions do not include disciplinary actions, poor performance evaluations, supervisor's reprimands, differential management, performance requirement standards, ignoring complaints of disparate treatment, or verbal threats to terminate. *See, e.g., Pegram v. Honeywell, Inc.,* 361 F.3d 272, 282 (5th Cir. 2004) (no adverse employment action without impact on job duties, compensation, or benefits); *Fort Bend Indep. Sch. Dist. v. Williams*, No. 01-13-00052-CV, 2013 WL 4779693, at *4 (Tex. App.—

---

[11] "Because the TCHRA follows the ADEA, we will analyze [Brod's] claims under the ADEA in conjunction with his claims under the TCHRA." *Maestas*, 546 Fed. Appx. at 425 n.1 (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633–34 (Tex. 2012) ("Section 21.051 is effectively identical to Title VII, its federal equivalent.... Because one of the purposes of the TCHRA is to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964,' we have consistently held that those analogous federal statutes and the cases interpreting them guide our reading of the TCHRA.")

Houston [1st Dist.] Sept. 5, 2013, *no pet*.) (poor performance evaluations, unjust criticism, being placed on probation, excessive scrutiny, and unwarranted discipline cannot support adverse employment action finding).

> **b.** **Brod's Resignation Is Not an Adverse Employment Action Because It Is Not A Constructive Discharge.**

Brod cannot rely on his resignation to support the "adverse employment action" element of his *prima facie* age discrimination case. A resignation constitutes an adverse employment action only when it amounts to a construction discharge. *See Newbury v. City of Windcrest, Tex.,*___ F.3d ___, 20-50067, 2021 WL 1085811, at *3 (5th Cir. Mar. 22, 2021). To prove a constructive discharge, Brod must show his "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Id* (quoting *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997). In determining whether working conditions are sufficiently intolerable, courts consider whether the plaintiff suffered: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 167 (5th Cir. 2007). If a plaintiff relies on harassment to prove constructive discharge, a greater degree of harassment than that required by a hostile environment claim" is required. *Newbury*, 2021 WL 1085811, at *3. Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). The test is objective, asking whether a "reasonable employee" in Brod's circumstances would have felt compelled to resign, not whether he actually felt compelled to resign. *Hinojosa v. CCA Properties of Am., LLC*, 400 Fed. Appx. 920, 922 (5th

Cir. 2010).

In this case, there is nothing that would make a reasonable person believe he must resign. Brod was not demoted, his salary and job responsibilities were not reduced, and he was not assigned "menial or degrading work" or offered early retirement.  Ex. A (Brod Dep.) at 999:6 210:4-10, 220:3-4, Ex. 2.    Brod may not have agreed with Urias' view of his performance but he was not badgered or humiliated in a way calculated to make him resign because of his age.  These facts alone are sufficient to grant summary judgment in Sprints favor.  *See, e.g., Tillman v. S. Wood Preserving of Hattiesburg, Inc.,* 377 Fed. Appx. 346, 350-351 (5th Cir. 2010) (no constructive discharge where employee received same salary and did not have job responsibilities reduced); *Microsoft Corp. v. Mercieca*, No. 14-15-00024-CV, 2016 WL 4479504, at *24 (Tex. App.-Houston [14th Dist.] 2016, *no pet.*) (finding no constructive discharge where employee was not demoted, did not experience reduction in job responsibilities, did not suffer loss of pay, and was not reassigned to menial work).

Furthermore, the final written warning Brod received in August 2018 and, after it was reduced, final warning written warning he received in October 2018, are insufficient to establish constructive discharge, as a matter of law.  *See Haley v. Alliance Compressor LLC*, 391 F.3d 644, 652 (5th Cir. 2004) (finding no constructive discharge despite humiliation and ostracization from peers, an "overly severe" performance plan and micromanagement by plaintiff's supervisor); *Brown v. Bunge Corp.*, 207 F.3d 776, 782-83 (5th Cir. 2000) (finding no constructive discharge, despite demotion and placement on performance improvement plan ("PIP")).

Lastly, the fact that Brod started searching for employment four (4) days after his August 2018 written warning, and before internal remedial avenues were complete, further undercuts his constructive discharge claim.  *See Aguirre v. Valerus Field Solutions,* L.P., 2019 WL 2570069

(S.D. Tex. Jan. 23, 2019)(court granted summary judgment on plaintiff's constructive discharge claim where plaintiff claimed she was forced to resign, but evidence revealed she had begun looking for another job when she felt like she had no chance of advancement, and despite allegations of being assigned more onerous job duties and unfair pay).[12]

### c.   Brod Was Not Treated Less Favorably Than Similarly Situated, Substantially Younger Employees.

Even if Brod somehow manages to create a fact issue on the foregoing elements, he fails to demonstrate he was treated less favorably than a similarly situated substantially younger district manager.  In order to prove a comparator is "similarly situated," a plaintiff must show the comparator's circumstances are "nearly identical" to those of the plaintiff. *Lee v Kansas City Southern Railway Co*, 574 F3d 253, 260 (5th Cir 2009).  The alleged conduct of the comparator must be "comparably serious." *Perez v Tex. Department of Criminal Justice, Institutional Division*, 395 F3d 206, 212 (5th Cir 2004); *Simpson v. Iasis Healthcare Corp.*, 4:19-CV-03140, 2020 WL 5223158, at *3 (S.D. Tex. Sept. 1, 2020).[13]

Here, there simply is no evidence of more favorable treatment of any substantially younger district manager performing like or worse than Brod.  There is simply no evidence of a district manager similarly failing, or refusing, to show any improvement.  Furthermore, the fact that Urias issued corrective actions to Josh Mamer (age 39), Vincent Senter (age 51), Marsha Huskey (age

---

[12] *See also Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008) (affirming summary judgment for employer on plaintiff's constructive discharge claim, finding allegations that she was not provided same career development opportunities, her complaints of discrimination were not investigated, she was not allowed comp time while others were, and that she was excluded from prestigious retreats showed "at best" that she was "disgruntled," that others had better benefits than she, and that she had difficulty with her supervisor).

[13] While there is no bright-line test in the Fifth Circuit for identifying a "substantially younger" employee, a comparator that is more than 5 years younger is likely considered substantially younger. *See Jenkins v. City of San Antonio Fire Dep't,* 784 F.3d 263, 269 (5th Cir. 2015)(citing *Rachid v. Jack In The Box, Inc.,* 376 F.3d 305, 312 (5th Cir.2004) (stating that an age difference of five years is a "close question").

53), Matt Taylor (age 33) and not Duana Jordan (age 46), and Albert Sunday (age 62) further undercuts any inference of age discrimination by Urias. Ex. D (Urias Dep.). at 91:23-98:14, Ex. E (Cox Decl.) ¶¶ 11, 17, 22-24, 28, 34-35,  Ex. 8, Exs. 13-17. Brod simply believes he suffered age discrimination, but such belief is insufficient. *See Mack v. John L. Wortham & Son, L.P.*, 541 Fed. Appx. 348, 361 (5th Cir. 2013) (affirming summary judgment and noting that "Mack has presented no support for her age discrimination claim other than her subjective belief that she would have been treated differently if she had been younger").

### 2. Plaintiff Cannot Establish the *Prima Facie* Elements of His Retaliation Claims.

Brod contends Urias issued the October 2018 corrective action in retaliation for raising age discrimination in his August 14, 2018 Ethics Complaint.  Ex. A (Brod Dep.) at 93:15—96:3, 192:16—193:4, 199:10—200:16.  Brod cannot prevail on his retaliation claims.

To prevail, Brod must first establish a *prima facie* case by proving: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the adverse employment action and the protected activity.  *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 260 (5th Cir. 2001).  Assuming *arguendo* Brod is able to demonstrate he engaged in a protected activity (element one), he fails to establish he suffered and adverse employment action causally connected to his protected activity.

### a. Brod's October 2018 Corrective Action Was Not an Adverse Employment Action.

For the reasons previously discussed in Section V.B.1.a. above, Brod's October 2018 corrective action was not an actionable adverse employment action.  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it will might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. and Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415

(2006). A legitimate disciplinary action is not an "adverse employment act" for purposes of establishing a *prima facie* case of retaliation. *See Juanita Dehart v. Baker Hughes Oilfield Operations, Inc*., 214 Fed. Appx. 437, 440 (5th Cir. 2007) (affirming summary judgment on retaliation claim in part because written warning to employee was not adverse employment action). A corrective action cannot dissuade a reasonable employee from making or supporting a charge of discrimination because a reasonable employee would understand that a corrective action "under these circumstances was not necessarily indicative of a retaliatory mind-set." *Id*. Even if Brod disliked Urias' managerial style, or demonstrated the corrective actions he received were unjustified, such facts would be insufficient to establish an actionable adverse action. *See, e.g., King v. Louisiana*, 294 Fed. Appx. 77, 85 (5th Cir. 2008) ("allegations of unpleasant work meetings, verbal reprimands, improper work requests and unfair treatment do not constitute adverse employment actions as...retaliation") (citations omitted); *Grice v. FMC Techs., Inc.*, 216 Fed. Appx. 401, 407 (5th Cir. 2007) (even unjustified reprimands are considered "trivial" and not materially adverse in the retaliation context).

> **b.** **There is No Causal Connection Between The October 2018 Corrective Action and Brod' Ethics Complaint.**

Even assuming the October 2018 corrective action rises to the level of being a dissuasive adverse action, there is no demonstrable causal connection between it and Brod's Ethics Complaint. In order to establish the causation prong of a retaliation claim, Brod is expected to demonstrate the decision-makers knew about his protected activity. *Manning v. Chevron Chem. Co.*, LLC, 332 F.3d 874, 883 (5th Cir. 2003). As previously discussed, neither Stevens nor Urias knew about Brod's age discrimination claim raised in his Ethics Complaint. Ex. D (Urias Dep.) at 60:1—3; Ex. B (Stevens Dep.) at 66:23-67:19, 71:2-6. And, Brod's performance challenges occurred and were documented *before* his Ethics Complaint, breaking any causal connection. *See*

*Verma v. Univ. of Pa.,* 533 F. App'x 115, 119 (3d Cir. 2013)(no causal link where employee's negative performance evaluations predated any protected activity); *Finch v. Texas Health & Human Serv. Comm'n,* No. H-13-3716, 2015 WL 5674834, at \*6 (S.D. Tex. Sept. 25, 2015)("[w]here timing is the only basis for a claim of retaliation, and gradual adverse job action began well before the plaintiff had ever engaged in any protected activity an inference of retaliation does not arise.")(quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)). In sum, Brod is unable to point to any evidence establishing the second or third elements of his *prima facie* retaliation claims.

### 3.    Brod Fails to Show Pretext.

Even if Brod established a *prima facie* case of age discrimination or retaliation (which he is not), Sprint has articulated a legitimate, non-discriminatory or non-retaliatory reason for its contested decisions.  *See Maestas*, 546 Fed. Appx. at 425 (applying burden-shifting standard to age discrimination claim); *Alkhawaldeh v. Dow Chem. Co*., 851 F.3d 422, 427 (5th Cir. 2017) (same for retaliation).  In doing so, Sprint need only "produce, rather than prove" the articulated reason.  *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004).  "'This burden is one of production, not persuasion,' and it involves no credibility assessment." *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019)  Having done so, the burden shifts back to Brod to show that Sprint's stated "reason is actually a pretext for retaliation and [age discrimination]" by producing evidence that could lead a reasonable fact-finder to conclude that "the adverse [employment] action would not have occurred 'but for'" the employee's engagement in the protected activity or the employee's age. *See Alkhawaldeh*, 851 F.3d at 427.[14]

---

[14] At this stage of the analysis, the "motivating factor" standard applies "in all [Chapter 21 Texas Labor Code] unlawful employment practice claims," but the "but-for" causation standard applies to Brod's ADEA age discrimination claim as well as retaliation claim.  *Peterson v. Bell Helicopter Textron, Inc*., 806 F.3d

Here, it is undisputed that Brod's documented performance challenges in the Houston market originated before his Ethics Complaint and continued afterwards.  Brod was not the only person to receive a corrective action from Urias; other district managers reporting to Urias, younger and older than Brod, received corrective actions.  None of the other aforementioned district managers that received corrective actions previously raised discrimination complaints. Notably, Urias did not issue corrective actions to Marsha Huskey (age 53), Duana Jordan (age 46), and Albert Sunday (age 62), individuals practically the same age or older than Brod.   And, Brod was hired when he was 47 years old, and was supervised primarily by others in his protected class (similar in age), such as Stevens and McCarter.  *See Reynolds v. Sovran Acquisitions, L.P.*, 2015 WL 6501552, at *11 (N.D. Tex. Oct. 27, 2015) (granting summary judgment on ADEA claim where plaintiff was over age 40 when defendant hired her).

Brod also cannot rely on his self-serving misinterpretation of Stevens' August 14, 2018 email.   Stevens' email (including the sentences Brod cherry-picked) neither expressly nor implicitly criticized Brod because of his age.  As Stevens (who was 44 years old at the time) explained, the purpose of his email (including the sentences Brod noted in his ethics complaint) was to emphasize changing the way Sprint did business because Sprint, as an organization, was changing.  Ex. B (Stevens Dep.) at 69:11—75:5); Ex. E (Cox Decl.) at Ex. 8.  As Stevens made clear, "just because *we've* being doing something one way for a long[] period of time does not mean that [it is] the best way going forward.  During these times *we* need to be side by side with our teams teaching them how to succeed not simply telling them what to do."  Ex. B (Stevens Dep.) at 73:10—74:9.  Stevens noted during his deposition that his email was "well received" by his team.  Ex. B (Stevens Dep.) at 71:3—15.  For example, McCarter, who is older than Brod, did

---

335, 338 (5th Cir. 2015) (citing *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) and *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–76 (2009)).

not believe there was a "hidden meaning" or "coded message" in Stevens' email and interpreted the email as Stevens' described.  Def. App. Ex. C (McCarter Dep.) at 50:15—52:21.

Under these facts, Brod's age was not the "but for" reason or "motivating factor" in Sprint's decision to issue and uphold corrective actions he received.  Such facts also demonstrate Brod's Ethics Complaint raising age discrimination was not the "but for" cause of his October 2018 corrective action.  Brod, again, simply *believes* Urias and Stevens discriminated against him because of his age or retaliated against him, but such beliefs, without evidence, fails to demonstrate pretext of age discrimination or retaliation.  *See Haskett v. T.S. Dudley Land Co*., 3:14-CV-277, 2017 WL 4155413, at *4 (S.D. Tex. Sept. 18, 2017) ("'Pretext cannot be established by mere 'conclusory statements' of a plaintiff who feels she has been discriminated against.'") (quoting *Malcolm v. Vicksburg Warren Sch. Dist. Bd. of Trs*., 709 Fed. Appx. 243, 248–49 (5th Cir. 2017)). For these reasons, Brod's discrimination and retaliation claims must be dismissed.

## VI.
## <u>CONCLUSION</u>

In conclusion, Brod's age had nothing to do with the feedback he received from his supervisor regarding his performance and his ethics complaint was not a factor in his supervisor's decision to properly manage his performance.  Brod was also not forced to resign.   Sprint is entitled to summary judgment for the reasons set forth above.  Sprint therefore asks the Court to dismiss all of Brod's counts and claims and this lawsuit with prejudice.

Respectfully submitted,


*/s/ Charles H. Wilson*
Charles H. Wilson
Texas Bar No. 0079767
Federal I.D. No. 34581
chawilson@littler.com
Ashley D. Thomas
Texas Bar No. 24090430
Federal I.D. No. 3088749
adthomas@littler.com

LITTLER MENDELSON P.C.
1301 McKinney Street
Suite 1900
Houston, TX  77010
Telephone:  713.951.9400
Facsimile:  713.456.2481

ATTORNEYS FOR DEFENDANT SPRINT/UNITED
MANAGEMENT COMPANY

Dated: March 26, 2021

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that he caused a copy of the foregoing Defendant Sprint/United Management Company's Motion for Summary Judgment to be served upon the following counsel of record via the Court's e-filing system, on March 26, 2021:

Terrence B. Robinson
TB Robinson Law Group, PLLC
7500 San Felipe Street, Suite 800
Houston, Texas  77063
Facsimile:  713.965.4288
TBRobinson@TBRobinsonlaw.com

ATTORNEYS FOR PLAINTIFF
DAVID BROD

_/s/ Charles H. Wilson_
Charles H. Wilson