**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DAVID BROD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **C.A. NO. 4:20-CV-01854** |
| **vs.** | § | |
| | § | **JURY DEMANDED** |
| **SPRINT CORPORATION and** | § | |
| **SPRINT/UNITED MANAGEMENT** | § | |
| **COMPANY,** | § | |
| | § | |
| **Defendants.** | § | |

---

### PLAINTIFF DAVID BROD'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

TO THE HONORABLE JUDGE OF SAID COURT:

<div style="margin-left:40%;">

Respectfully Submitted,
TB Robinson Law Group, PLLC

_Terrence B. Robinson_
Terrence B. Robinson
Fed. Bar No. 14218
Texas Bar No. 17112900
Email: TRobinson@TBRobinsonlaw.com
Zachary Sanders
Fed. Bar No. 3606552
State Bar No. 24118522
Email: ZSanders@TBRobinsonlaw.com
7500 San Felipe St., Suite 800
Houston, Texas 77063
Phone: (713) 568-1723
Facsimile: (713) 965-4208
**ATTORNEYS FOR PLAINTIFF**

</div>

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. 3

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR

SUMMARY JUDGMENT .................................................................................................. 6

   **I.**    **NATURE AND STAGE OF THE PROCEEDING** ....................................... 6

   **II.**    **STANDARD OF REVIEW** ................................................................................ 7

   **III.**   **FACTUAL BACKGROUND** ............................................................................. 7

   **IV.**   **SUMMARY OF ARGUMENT** ......................................................................... 14

   **V.**    **ARGUMENTS AND AUTHORITIES** ............................................................ 15

    **A.**  **Plaintiff Can Establish His Prima Facie Case of Age Discrimination Under the**

    **ADEA** .................................................................................................................. 16

    **1.**   **Mr. Brod was a within the protected class and qualified for his position.** ............. 17

    **2.**   **Mr. Brod Suffered adverse employment actions.** ........................................ 17

    **3.**   **Mr. Stevens' remarks exemplified discriminatory animus.** ..................................... 20

    **4.**   **Younger employees were treated more favorably than Mr. Brod.** .......................... 22

    **5.**   **Sprint constructively discharged Mr. Brod.** ............................................. 24

    **B.**  **Plaintiff Can Establish His Prima Facie Case of Retaliation Under the ADEA** .... 26

   **VI.**   **CONCLUSION AND PRAYER** ..................................................................... 30

CERTIFICATE OF SERVICE ........................................................................................ 31

**ORDER** ........................................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

*Affairs v. Burdine*

450 U.S. 248, 250 (1981).................................................................................. 16

*Allain v. Bd. of Supervisors of Univ. of Louisiana Sys.*

81 F. Supp. 3d 502, (W.D. La. 2015).............................................................. 24

*Anderson v. Liberty Lobby, Inc.*

477 U.S. 242 (1986)........................................................................................... 7

*Barrow v. New Orleans Steamship Association*

10 F.3d 292, 297 (5th Cir. 1994) ................................................................... 25

*Brown v. Bunge Corp.*

207 F.3d 776, 782 (5th Cir. 2000) ................................................................. 25

*Byers v. Dall. Morning News, Inc.*

209 F.3d 419, 428 (5th Cir. 2000) ................................................................. 27

*Celotex Corp. v. Catrett*

477 U.S. 317 (1986)........................................................................................... 7

*Davis v. CSC Logic*, Inc.

82 F.3d 651, 654 (5th Cir. 1996) ................................................................... 16

*Dillon v. Rogers*

596 F.3d 260 (5th Cir. 2010) ........................................................................... 7

*Haire v. Bd. of Sup'rs of Louisiana State Univ. Agric. & Mech. Coll.*

719 F.3d 356, 368 (5th Cir. 2013) ................................................................. 29

*Heggemeier v. Caldwell Cty., Texas*

826 F.3d 861, 869 (5th Cir. 2016) ........................................................ 26

*Holtzclaw v. DSC Commc'ns Corp.*

*255 F.3d 254, 259 (5th Cir. 2001)* ........................................................ 26

*LaPierre v. Benson Nissan, Inc.*

86 F.3d 444 (5th Cir. 1996) ........................................................ 15

*Little v. Liquid Air Corp.*

37 F.3d 1069 (5th Cir. 1994) ........................................................ 7, 21

*McDonnell Douglas Corp. v. Green*

411 U.S. 792 (1973) ........................................................ 15

*McFaul v. Valenzuela*

684 F.3d 564 (5th Cir. 2012) ........................................................ 7

*McInnis v. Alamo Cmty. College Dist.*

207 F.3d 276, 282 (5th Cir. 2000) ........................................................ 16

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*

934 F.3d 447, 457 (5th Cir. 2019) ........................................................ 21

*Nowlin v. RTC*

33 F.3d 498, 507–08 (5th Cir.1994) ........................................................ 28

*Palasota v. Haggar Clothing Co.*

342 F.3d 569, 576 (5h Cir. 2003) ........................................................ 16

*Rachid v. Jack in the Box*, Inc.

376 F.3d 305 (5th Cir. 2004) ........................................................ 16

*Rutland v. Moore*

54 F.3d 226, 228 (5th Cir. 1995) ........................................................ 16

4

*St. Mary's Honor Center v. Hicks*

509 U.S. 502, 113 S. Ct. 2742 (1993) ........................................................... 16

*St. Mary's Honor Center v. Hicks*

509 U.S. 502, S. Ct. 2742 (1993) ................................................................. 15

*Stults v. Conoco, Inc.*

76 F.3d 651, 656 (5th Cir. 1996) ................................................................. 16

*Texas Dep't of Community Affairs v. Burdine*

*450 U.S. 248, 252-53 (1981)* ..................................................................... 15

*Ward v. Midwestern State Univ.*

217 Fed. Appx. 325  (5th Cir. 2007) ............................................................ 15

**Statutes**

29 U.S.C. § 623 (a)(1) ................................................................................. 16

29 U.S.C. § 623(d) ...................................................................................... 27

29 U.S.C. § 630 ............................................................................................ 6

29 U.S.C. § 631 (a) .................................................................................... 16

Fed. R. Civ. P. 56 ......................................................................................... 7

TEX. LAB. CODE § 21.051 ............................................................................. 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DAVID BROD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **C.A. NO. 4:20-CV-01854** |
| **vs.** | § | |
| | § | **JURY DEMANDED** |
| **SPRINT CORPORATION and** | § | |
| **SPRINT/UNITED MANAGEMENT** | § | |
| **COMPANY,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

DAVID BROD (hereafter, Mr. Brod), by his Attorney of record, Terrence B. Robinson, files this, Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, and in support would show as follows:

## I.   NATURE AND STAGE OF THE PROCEEDING

1.      On October 23, 2018, Plaintiff brought this action under 29 U.S.C. § 630 ("ADEA") against the Sprint/United Management Company (hereafter "Sprint") for age discrimination, hostile work environment and retaliation and for age discrimination pursuant to Chapter 21 of the Texas Labor Code. TEX. LAB. CODE § 21.051. Discovery concluded on March 4, 2021. Trial is set for July 30, 2021.

2.      Plaintiff seeks equitable relief, back and future pay, lost benefits, reinstatement, liquidated, compensatory and punitive damages, any and all other damages allowed for violations of the ADEA and Chapter 21 of the Texas Labor Code.

6

## II.   STANDARD OF REVIEW

3.     Pursuant to Rule 56 of the Federal Rules of Civil Procedure, it is the moving party's burden to establish that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56;  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "A genuine dispute as to a material fact exists 'if the evidence is such that reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In other words, if the evidence is such that a reasonable trier of fact could resolve the dispute in the nonmoving party's favor, then there is a genuine issue of material fact that exists which precludes summary judgment. See *Anderson*, 477 U.S. at 249. All facts and inferences are construed in light that is most favorable to the nonmoving party. *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012) (quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)).  If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response.  *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994).

## III.   FACTUAL BACKGROUND

4.     Mr. Brod began working for RadioShack in 1986. *Exhibit* 1, Brod's Resume. Over the following 28 years Mr. Brod spent with the company he worked his way up from a Sales Associate to District Director and never received a disciplinary action. *Exhibit* 2, Brod Dep. 37:18 – 37:23. However, Mr. Brod's career with RadioShack came to an abrupt halt when the company filed for bankruptcy, and as a result, laid Mr. Brod off. *Exhibit* 2, Brod Dep. 41:3 – 41:9.

5.     Mr. Brod was referred to Sprint by Dawn McCarter (hereafter, "Ms. McCarter") in 2015 and was quickly hired as a District Manager (hereafter, "DM") in February 2015. *Exhibit 3*, McCarter Dep.  18:9 – 18:11; *Exhibit* 2, Brod Dep. 116:25 – 117:8. Ms. McCarter had worked

closely with Mr. Brod since 1997, when he was at RadioShack and witnessed Mr. Brod's work ethic and competence while he was at the company. *Exhibit 3*, McCarter Dep.  16:16 – 16:21.

6.      As a DM for Sprint Mr. Brod directly responded to the Assistant Retail Director (hereafter "ARD"), in turn the ARD directly responded to the Regional President (hereafter, "RP"). *Exhibit 5*, Sprint's Position Description. The ARD initially in charge of supervising Mr. Brod was Art Pennington (hereafter, "Mr. Pennington"). *Exhibit 3*, McCarter Dep.  46:25 – 47:11. During Mr. Brod's time being managed by Mr. Pennington, he did not receive a write up or any type of disciplinary action.

7.      Mr. Brod proved to be a dutiful and competent DM; as a result, Mr. Brod was placed over a pilot program called Sprint Team at RadioShack (hereafter, "STARS") in April 15, 2015. *Exhibit 6,* Stevens Dep. 20:25-21:8. The STARS program placed Sprint kiosks inside of RadioShack's stores. *Exhibit 4,).* Mr. Brod was responsible for 92 of STARS kiosk in South Texas and Louisiana. *Exhibit 4*. The STARS program lasted until January 2017 after disputes arose between Sprint and RadioShack over retail leases. *Exhibit 4*. Mr. Brod was then responsible for a project where nine RadioShack locations were converted into full Sprint stores. *Exhibit 4*. Over the time that Mr. Brod served on the STARS team, he had not received any disciplinary action or corrective action.

8.      Once the project ended, Mr. Brod returned to his DM role over the Southwest Houston District. *Exhibit 4*, Brod Statement. In May 2017, Ms. McCarter replaced Mr. Pennington as an ARD and Mr. Brod's direct supervisor. *Exhibit 3,* McCarter Dep.  16: 10 – 16:12. Mr. Brod worked with Ms. McCarter at RadioShack, and their relationship was so successful that Ms. McCarter began to regard Mr. Brod as a friend. *Exhibit 3*, McCarter Dep.  19:5 – 19:11. During this time, Mr. Brod made great strides in improving the underperforming stores in his district.

9.      As Mr. Brod's direct supervisor, Ms. McCarter and Mr. Brod had a great working relationship and the two engaged in regular conversation about his and his district's performance. *Exhibit 3*, McCarter Dep.  19:5 – 19:11. Under Ms. McCarter's supervision, Ms. McCarter did not feel the need to take disciplinary action against Mr. Brod. *Exhibit* 3, McCarter Dep.  56:17 – 56:21. Ms. McCarter recognized Mr. Brod's willingness to listen and take direction. *Exhibit 3,* McCarter Dep.  48:15 – 48:19. However, that did not stop her direct supervisor, RP John Stevens (hereafter, "Mr. Stevens"), from encouraging Ms. McCarter to take strong action against Mr. Brod. *Exhibit 3,* McCarter Dep.  78:15 – 78:17; *Exhibit* 8, Brod ADR statement.  However, despite Mr. Stevens assertions, Ms. McCarter still decided not to take disciplinary action against Mr. Brod because she would only do so if she felt that it was necessary, and she did not feel that it was necessary with Mr. Brod. *Exhibit 3,* McCarter Dep.  56:17 – 56:21; McCarter Dep.  33:20 – 34:2.

10.      However, any chance of having a productive working relationship with his supervisor went out of the window when Rick Urias (hereafter, "Mr. Urias") took over Ms. McCarter's position as ARD and Mr. Brod's direct supervisor in April 2018. *Exhibit 7,* Urias Dep. 14:1 – 14:6. Despite Mr. Brod winning an award for his superb metrics performance, Mr. Urias still took an especially harsh approach with Mr. Brod. *Exhibit* 9, Award. He would go to stores that Mr. Brod managed while he was not present at the stores and ask trick questions designed to find fault in Mr. Brod's management style. *Exhibit* 10, Brod's Ethics Complaint. Mr. Urias would ignore that training the store staff is the store manager's duty and blame Mr. Brod for any question that store staff could not answer even if the question was neither crucial nor relevant to the staff's ability to carry out their duties. *Exhibit* 10; *Exhibit* 33, Sprint Position Descriptions. Mr. Urias would also conduct store inspections while Mr. Brod was not scheduled to be at that store and blame Mr. Brod for any mundane issue that he found even though Mr. Brod was not scheduled to

be at the store to inspect and correct any issues on the premises that day or week. *Exhibit* 10. Mr. Urias ignored the fact that he pointed out common issues amongst stores in every other district and chose to home in on Mr. Brod. *Exhibit* 10.

11.     Mr. Brod knew that Mr. Urias' effort to find fault in his performance was part of a larger scheme to get rid of him and older managers. Mr. Brod's suspicions were confirmed when he noticed Mr. Stevens dedicating more of his time to mentoring younger employees to help them advance through the company. *Exhibit* 8.

12.     Contrastingly, Mr. Stevens avoided contact with Mr. Brod at every turn. Mr. Stevens would avoid eye contact with Mr. Brod when they were in the same room and would keep conversations brief. *Exhibit* 28, Brod's Resignation letter. Throughout Mr. Brod's tenure with Sprint, he only saw Mr. Stevens four times. *Exhibit* 28. Mr. Stevens ambivalence to Mr. Brod made any opportunity for advancement scarce. Mr. Brod could not even get consideration for an ARD position despite having more than 30 years' worth of experience in retail and Mr. Stevens' supposed willingness to consider people with relevant experience for advancement within the company. *Exhibit* 1; *Exhibit 6,* Stevens Dep. 84:7 – 85:6; *Exhibit* 10.

13.     In March 2018, Mr. Brod tried to set up a meeting to discuss his desire to advance within the company and his feeling that Mr. Stevens was out to get him since he had already terminated Ernie Douglass (age 56). *Exhibit 8,* Brod's ADR complaint. Mr. Stevens remained unreceptive towards Mr. Brod's complaint and disregarded it immediately. *Exhibit* 11, Stevens ADR Interview.

14.     Although Mr. Brod did not receive any reprieve from the grievances that he raised with Mr. Stevens, Mr. Brod continued to work hard at managing his stores and maintaining his relationship with Sprint. However, Mr. Urias continued to mercilessly target Mr. Brod. In June

2018, Mr. Urias issued Mr. Brod a vague verbal warning that did not cite any particular performance issues or opportunities for improvement. *Exhibit* 23, verbal warning; *Exhibit* 13, Sprint Metrics.

15.     Following the write up, Mr. Brod was not given any 1:1 coaching or assistance to remedy Mr. Brod's alleged faults. *Exhibit* 2, Brod Dep 86:14 – 87:3; *Exhibit* 8.  Instead, Mr. Urias continued to cut Mr. Brod out of store inspections and staff audits and pretending that he had knowledge of what task Mr. Brod had or had not completed despite Mr. Urias never asking Mr. Brod if he completed the tasks in question and Mr. Brod sending Mr. Urias constant updates of his store activities and seeking his advice on how to discipline his subordinates. *Exhibit 7,* Urias Dep. 24:23 – 25:15; *Exhibit 2,* Brod Dep. 86:14 – 87:3; *Exhibit* 8; *Exhibit* 12, Brod Emails to Mr. Urias; *Exhibit 30*, Brod's Follow-up Email; *Exhibit* 31 Brod's Update Email; *Exhibit* 32; Brod's Store Record Email. However, Mr. Urias would make sure to document whatever he was able to dig up and use the document as a weapon for later use instead of informing Mr. Brod of his findings and coaching him on how to improve. *Exhibit 2,* Brod Dep. 86:14 – 87:3.

16.     Mr. Urias utilized each visit to the 13 stores that Mr. Brod oversaw to pretextually transition him from being an award-winning district manager that delivered strong results in his district to falsely framing him as an incompetent leader of his team within a matter of months. Mr. Urias took things a step further when Sprint switched from a metrics evaluation to a score card evaluation in July 2018. *Exhibit* 13, Metrics. The new score card evaluation brought a large change to the way DM's metrics looked on paper. Therefore, it was Sprint's policy that DMs be evaluated by both the old and new metrics for at least three months. *Exhibit 6,* Stevens Dep. 78:11 – 78:14. However, Mr. Urias ignored Sprint's evaluation policy and decided to look only at the new metrics when evaluating Mr. Brod's performance. *Exhibit 7,* Urias Dep.  55:4-55:22. As a

result of the metrics shift, Mr. Brod's focused metrics faced a sudden downturn while he and his stores were still adjusting to the new metrics. *Exhibit* 13.

17.     Mr. Urias opportunistically noticed this shift in the metric numbers and immediately placed Mr. Brod on a Final Written Warning on August 14, 2018 with Sprint's permission and Mr. Stevens' knowledge. *Exhibit* 14, Brod First Final Warning. This warning was manufactured out of mischaracterizations, inconsequential facts, and outright falsehoods. *Exhibit* 15, Brod ADR complaint; *Exhibit* 14. These mischaracterizations included statements that Mr. Brod relied on Mr. Urias to make human resources decisions when he in fact sought his counsel pursuant to Sprint's corrective action policy. *Exhibit* 16, Brod Email to HR; *Exhibit* 17, Sprint's Corrective Action Policy. The final write up also contained demonstrably false accusations such as Mr. Brod deciding on his own to open store 1504 ahead of schedule, despite Mr. Brod making it clear that he opened the store according to schedule. *Exhibit* 10. Mr. Urias gave Mr. Brod two and a half weeks to improve his performance. *Exhibit* 14.

18.     To make matters worse, Mr. Stevens sent out an email the same evening that was unmistakably ageist. *Exhibit* 18, Stevens Staff Email. The email stated "Years of experience don't always translate into best practices" and "Today's problems demand new skills and many of our partners haven't fully developed these new skills even though we have great tenure in our management ranks." *Exhibit* 18. It was clear that the email was directed solely towards older employees as the email made no mention of younger employees.

19.     Mr. Brod understood that his warning in conjunction with Sprint's ageist emails and favoritism towards younger employees demonstrated an illegal intention to target him. Therefore, Mr. Brod filed an ethics complaint with Sprint's HR department with the hope of participating in Sprint's internal Alternative Dispute Resolution program ("ADR"). *Exhibit* 10;

*Exhibit* 35, ADR Resolution Process. Mr. Brod gave his initial information to Steve Cox in Human Resources. Shortly after, a local Human Resources employee, informed Mr. Brod that the ADR program was being reworked, and that his complaints would have to then go through his chain of command, including Mr. Stevens, despite Mr. Stevens' age-baiting remarks being a major component of Mr. Brod's complaints. *Exhibit 2,* Brod Dep. 74:7 – 76:2. However, Sprint later reversed course and then allowed Mr. Brod to go through the ADR process with another District President based out of Seattle. *Id.*

20.     Ultimately, Sprint did not take action on Mr. Brod's discrimination claim and informed Mr. Brod of their intention to roll back the August final warning to a written on September 20, 2018. *Exhibit* 29, Sprints Timeline of Events; *Exhibit* 14. In response, Mr. Brod emailed HR personnel, Andrea Nelson, and informed her that he felt that HR did not conduct a thorough investigation. *Exhibit* 16, Brod's email to Andrea Nelson. Mr. Brod informed Sprint that they committed a huge oversight when they only interviewed Mr. Brod's supervisors but not the store staff that worked under Mr. Brod when the alleged infractions occurred. Mr. Brod also emphasized the frivolous and discriminatory nature of Mr. Urias' store inspections. *Exhibit* 16. However, Sprint failed to investigate Mr. Brod's claims further.

21.     Mr. Brod hoped that the worst was behind him, but unfortunately that was not the case. In direct retaliation for Mr. Brod exercising his right to report age discrimination in the workplace, Mr. Urias called Mr. Brod into a meeting on October 9, 2018 to discuss the status of the write-up.  Mr. Urias informed Mr. Brod that the first final write-up would be rolled back to written warning and that he would be issuing another final warning effective immediately, despite Mr. Urias knowing that Sprint was correct to roll back the final warning to a written warning. *Exhibit 7,* Urias Dep.  23:18 – 23:22; *Exhibit* 30. Mr. Urias did not update the alleged performance

concerns in the final warning or state whether Mr. Brod completed any of the tasks that he had been assigned as part of his corrective initial action plan. *Exhibit* 19, Sprint's Final Warning.

22.     The second final warning deeply unsettled Mr. Brod. Despite three and a half years of highly dedicated loyalty and service to Sprint and no prior record of corrective action plans being implemented against him, Mr. Brod was being fast tracked for termination in retaliation for his complaints. Neither Mr. Stevens nor Sprint's Human Resource Department were willing to step in and stop it. The stress of this environment was entirely unrelenting and took an extreme emotional toll on Mr. Brod and he began to suffer from severe bouts of anxiety. *Exhibit* 27, Mr. Brod's anxiety medication; *Exhibit 2,* Brod Dep. 23:4 – 23:12. Mr. Brod, having no other method to escape this intolerable situation with a final warning being restated the same day as its reversal, accepted another position outside of Sprint and gave his notice of resignation on October 19, 2018 with his last day scheduled for November 2, 2018. *Exhibit* 20, Brod's Resignation Email. Mr. Brod was clear in his email that he was leaving the company because of the pervasive discrimination that he faced. *Exhibit 20.* Mr. Urias and Mr. Stevens were able to force him out of Sprint without recourse or reprimand.

### IV.   SUMMARY OF ARGUMENT

23.     Mr. Brod presents competent evidence to establish a prima facie case of age discrimination and retaliation under the ADEA and Chapter 21. The evidence demonstrates that due to Plaintiff's age, Sprint management discriminated against Mr. Brod, treated him less favorably than his younger colleagues, and retaliated against him because he engaged in protected activity. Defendants do not meet their burden of producing a legitimate, nondiscriminatory reason for each of their adverse actions. Further, Mr. Brod presents competent evidence, including but not limited to Sprint's inaccurate business records and conflicting testimonies between Sprint's

management personnel that demonstrates Sprint's proffered reasons for adverse employment actions against Mr. Brod, including his constructive termination, are pretext for unlawful discrimination and retaliation. Abundant evidence exists for a reasonable jury to find that but for his age and protected activities, Sprint would not have taken the actions it did against Mr. Brod. For all these reasons, the Court should deny Sprint's Motion for Summary Judgment.

## V.   ARGUMENTS AND AUTHORITIES

**McDonnell-Douglas Burden-Shifting Framework for Discrimination Cases**

24.     In the context of an employment discrimination case, the burden of production shifts back and forth between an employer and the employee under an analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). First, the Plaintiff must establish a prima facie case of discrimination by showing that he was (1) within a protected class, (2) that he was qualified for the job, (3) he suffered an adverse employment decision, and that (4) employees outside the protected class were more favorably treated than those in the protected class. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742 (1993); and *LaPierre v. Benson Nissan, Inc*., 86 F.3d 444 (5th Cir. 1996).

25.     The Plaintiff bears the initial burden of proving a prima facie case of discrimination, but need only offer evidence, which "gives rise to an inference of unlawful discrimination." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).   The Fifth Circuit has observed that the employee need only make a "very minimal showing" at the prima facie stage. *Ward v. Midwestern State Univ*., 217 Fed. Appx. 325, 327 (5th Cir. 2007).   Under the modified McDonnell Douglas test, to survive a motion for summary judgment, a Title VII plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas Corp.,* 411

U.S. 792, 802-04; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

26.     After Plaintiff creates a rebuttable presumption of discrimination by putting on a prima facie case, then the burden shifts to the employer to rebut with a legitimate, nondiscriminatory reason for the challenged employment action. *Affairs v. Burdine*, 450 U.S. 248, 250 (1981); *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 506 (1993).   Once the employer articulates a reason, then the burden shifts back to the employee who must establish by a preponderance of the evidence that the articulated reason was mere pretext for unlawful discrimination. *McInnis v. Alamo Cmty. College Dist.*, 207 F.3d 276, 282 (5th Cir. 2000).

27.     The ADEA makes it unlawful for an employer to discriminate against any individual with respect to the terms, conditions, or privileges of employment because of his age. 29 U.S.C. § 623 (a)(1). Protected individuals are those over age 40. 29 U.S.C. § 631 (a). In essence, the ADEA makes it unlawful for an employee, who is at least 40, to be discharged or otherwise subjected to an adverse employment action because of his age. *Rutland v. Moore*, 54 F.3d 226, 228 (5th Cir. 1995).

## A. <u>Plaintiff Can Establish His Prima Facie Case of Age Discrimination Under the ADEA</u>

28.     Mr. Brod can establish prima facie case of age discrimination under the ADEA based on a wrongful discharge requires a showing that he: (1) suffered adverse employment action; (2) was within the protected class (forty or more years of age); (3) was qualified to perform the job in which he was adversely affected; and (4) was discharged because of his age. See *Davis v. CSC Logic*, Inc., 82 F.3d 651, 654 (5th Cir. 1996); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004); *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5h Cir. 2003); Stults v. Conoco, Inc., 76 F.3d 651, 656 (5th Cir. 1996).

1. **Mr. Brod was a within the protected class and qualified for his position.**

29.     In this case, Mr. Brod was a member of the protected class. At the time of the events that form the basis of his claim occurred, Mr. Brod was 50 years old. *Exhibit* 4. Furthermore, Mr. Brod was qualified to perform his job. Mr. Brod worked for RadioShack for 28 years and became a District Director. *Exhibit* 1. Ms. McCarter recognized his qualifications and his ability to do his job and referred him to the DM position with Sprint.   *Exhibit* 3, McCarter Dep.  16:16 – 16:21.

2. **Mr. Brod Suffered adverse employment actions.**

30.     Mr. Brod suffered an adverse employment action. Sprint forms their argument in their Motion for Summary Judgment by relying on inconsistent, vague, contradictory, dubious, and sometimes convoluted narratives that do nothing more than further highlight the material fact issues of this case and the reasons why this case is ripe for a jury to make a finding for Mr. Brod. Despite Mr. Brod being an award-winning performer who had even outperformed his supervisor, Rick Urias, in the metrics, he was nonetheless fast tracked for termination by Sprint. *Exhibit* 13; *Exhibit* 9. Mr. Urias became Mr. Brod's manager in April 2018 and despite Mr. Brod having strong and consistent metrics scores, Mr. Urias nonetheless, gave Mr. Brod a *final* written warning the first instance Mr. Urias could detect any appearance of fault in Mr. Brod's performance. *Exhibit* 13. Furthermore, the final warning laid out a string of dodgy reasoning and one-off events as a means of justifying the final write up.

31.     Sprint alleged Mr. Brod failed to perform efficient inspections, had poor time management and planning skills, and a lackluster sense of urgency, which Sprint claims resulted in unremarkable metric scores. *Exhibit* 14. Sprint can hardly justify immediate movement to a final warning under these circumstances and even less so considering it rolled back the final warning following Mr. Brod's complaint.

32.     Out of the 13 stores that Mr. Brod managed for three and a half years, Sprint could only identify one scoreboard in one store wherein Mr. Brod had not been able to inspect because he had to also supervise store staff and tend to imperative matters that required his immediate attention. *Exhibit* 14; *Exhibit* 8; *Exhibit* 4. Sprint also liberally and arbitrarily proclaimed that Mr. Brod lacked urgency without giving any context or explanation as to the charge. However, Mr. Urias has managed to utilize the accusation as a weapon to desecrate Mr. Brod's career track record and professional reputation. *Exhibit 3,* McCarter Dep.  57:20-57:23; *Exhibit* 14. Mr. Urias even went as far as to ignore Sprint's policy to review old metric views in tandem with new metric views for at least three months when assessing Mr. Brod's performance. *Exhibit 7,* Urias Dep. 55:4-55:22; *Exhibit 6,* Stevens Dep. 78:11 – 78:14. Furthermore, Mr. Urias failed to create a causal connection between Mr. Brod's performance and the score card measurements and completely ignored any improvements Mr. Brod made in his metrics, which was the alleged basis of Mr. Brod's verbal warning. *Exhibit* 13; *Exhibit* 23 Sprint's Verbal Warning; *Exhibit* 14.

33.     Although Mr. Brod was supposed to receive training as a part of his corrective action plan, Mr. Urias provides no evidence that he ever met with Mr. Brod to discuss any deficits in his performance. However, Mr. Urias did confess that he destroyed evidence upon his leaving Sprint and after Mr. Brod gave notice that Plaintiff retained an attorney and requested the preservation of evidence. *Exhibit 2,* Brod Dep. 86:14 – 87:3; *Exhibit* 14; *Exhibit* 16, Letter of Representation. Furthermore, Mr. Urias claims he would visit stores managed by Mr. Brod while he was not present to observe and question the store staff and use whatever information that he could find to create a glimmer of fault in Mr. Brod's performance. *Exhibit 7,* Urias Dep.  24:23 – 25:15. Mr. Urias admits he never bothered to ask Mr. Brod about his training routine or history. Instead, Mr. Urias would use any lapse in memory or judgment in Sprint store employees as a

convoluted justification that Mr. Brod had neither trained, nor supervised them properly despite Mr. Brod or any other District Manager's inability to witness and observe all of Sprint's store staff across a group of 13 stores - each of which containing direct store managers for this purpose. *Exhibit 7,* Urias Dep. 36:21 – 36:22; *Exhibit* 33.

34.     Contrary to Sprint's representation, Mr. Brod worked hard to properly train his staff and to ensure that they understood what it took to move products off the shelves. In store 1747, Mr. Brod asked an Assistant Store Manager who successfully worked his way up his previous position as a sales associate to show the associates how to properly conduct the sales by working the sales floor with them. *Exhibit* 10. Sprint took the opportunity to pervert the exercise by making it a part of his first final warning and saying that it lowered morale despite there being no proof or staff complaints to back up their claim. *Exhibit 7,* Urias Dep. 65:17 – 66:19; *Exhibit* 14. Sprint added insult to injury by plagiarizing Mr. Brod's idea and requiring Mr. Brod and other District Managers to work the sales floor as a training exercise. *Exhibit* l0.

35.     In one of the many contradictions and inconsistences of Mr. Urias' illustration of the events and his logic, Mr. Urias listed Mr. Brod's reliance on Sprint's Human Resources team and insistence on investigating the employee's recollection of events before deciding an employee's future with the company. *Exhibit* 14. The employee was caught on tape pushing a customer, but the employee and some witnesses claimed that the employee did it by accident and the employee had no history of aggressive behavior. *Exhibit* 15; *Exhibit* 14; *Exhibit* 34, Mr. Brod's Disciplinary Inquiry. Mr. Brod handled the situation in a thorough and controlled manner and did not violate Sprint's policy on employee disciplinary action. *Exhibit* 21, Sprint's Corrective Action Plan. Sprint failed to offer any explanation as to why Mr. Brod thoroughly investigating the conflicting accounts of the altercation and receiving counsel from Human Resources and his

managers constituted a disciplinary infraction. *Exhibit* 10. However, Sprint found no issue with Mr. Urias relying on Human Resources before issuing the first final warning. Mr. Stevens admitted in his deposition that he allowed his subordinates to use discretion on how to handle disciplinary decisions with the employees they manage, however, that rule apparently did not apply when Mr. Brod was the decision maker. *Exhibit 6,* Stevens Dep. 80:13 – 80:20.

36.     Sprint managed to contrive ways to punish Mr. Brod for using his managerial discretion even when he did so with the permission of Sprint management personnel. As Mr. Brod's direct supervisor, Mr. Urias accused Mr. Brod of opening store 1504 before the store was scheduled to open. *Exhibit* 10. Mr. Urias' claim that Mr. Brod defied instructions and opened a store before the approved dates stands in direct contradiction with Mr. Urias' and Mr. Stevens' claim in their depositions that the decision to open a store is made at the discretion to the district manager. *Exhibit 7,* Urias Dep.  67:4 – 67:19. Furthermore, Sprint has failed to cite any rule or regulation that Mr. Brod violated by not waiting to open the store. Mr. Brod has made it clear to Sprint during the ADR process that he opened the store according to the schedule.  Nonetheless, Sprint used Mr. Brod's discretion against him in an attempt to terminate his employment.

### 3.  Mr. Stevens' remarks exemplified discriminatory animus.

37.     Mr. Urias' write up, rife with misinformation and exaggerated information, was not the only instance of adverse treatment that Mr. Brod was forced to endure. Mr. Brod was also subjected to ageist comments, which despite Sprint's claims, were clearly directed towards older worker's such as himself. Sprint's Motion for Summary Judgement refers to Mr. Brod's interpretation of the ageist comments contained in Mr. Stevens' emails as "self-serving", when in fact, Mr. Stevens is the one with a self-serving motive to portray his own discriminatory emails in an innocent light in order to protect his current position with Sprint. *Exhibit 6,* Stevens Dep. 71:3

– 71:15. Mr. Stevens' ageist comments were devastating to Mr. Brod's relationship with Sprint and although Sprint urges the Court to disregard Mr. Stevens' email as proof of Mr. Brod's claims, Sprint erroneously ignores the law surrounding discriminatory comments by a supervisor.

38.     While the plaintiff must connect age-related comments to a person with power over the firing decision, the plaintiff can satisfy this requirement by showing that the speaker "is in a position to influence the decision." *Palasota*, 342 F.3d 569, 578. Similarly, age-related comments should be appropriately considered even where the comment is not in the direct context of the termination. *Id.* (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 229 (5th Cir. 2000)).

39.     In this case, Mr. Stevens was the RP and the direct supervisor of Mr. Brod's direct supervisor, Mr. Urias. Thus, Mr. Stevens was in a prime position to influence Mr. Urias' decision on whether to fire or discipline Mr. Brod. Furthermore, Mr. Brod is not offering Mr. Stevens' comments as direct evidence of discrimination, but rather as indirect evidence. In indirect evidence cases, courts apply a less demanding standard because "the discriminatory remarks are just one ingredient in the overall evidentiary mix." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457 (5th Cir. 2019).

40.     Under this less demanding standard, the plaintiff must show that the comments involve "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Id.*

41.     In this case, Mr. Stevens discriminatory animus is clear from the email that he sent to Sprint staff, which targeted older workers by stating "Years of experience don't always translate into best practices" and "Today's problems demand new skills and many of our partners haven't fully developed these new skills even though we have great tenure in our ranks." *Exhibit* 18;

*Exhibit* 4. The email clearly singled out older workers and was a veiled method of accusing older workers such as Mr. Brod of being incapable of adapting to the demands of their job despite evidence to the contrary. The statements that Mr. Stevens made in his emails are proof on its face of discriminatory intent. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 (5th Cir. 2005) (holding that an employer's emails gave rise to an inference that Plaintiff was discriminated against because of his age after the employer sent emails stating that Plaintiff was "inflexible" and "unable to adapt to change."). Mr. Stevens claims that the statement applied to all of the District Managers, but the email notably fails to address less tenured staff and their ability to adapt to workplace changes. *Exhibit 6,* Stevens Dep. 71:3 – 71:16; *Exhibit* 18. Sprint's only evidence to corroborate their claim that the email was innocent was Mr. Urias, who was 33 at the time and not the subject of the email. Sprint also relies on Ms. McCarter's ultimately uninformed opinion about the meaning of an email that she did not recall reading prior to her deposition. *Exhibit 3,* McCarter Dep.  50:20 – 51:7.

**4.  Younger employees were treated more favorably than Mr. Brod.**

42.    Furthermore, although Mr. Stevens, Ms. McCarter, and Mr. Urias all maintain that Mr. Stevens left the decisions regarding the employment status of the District Managers up to the ARD, it is clear that he still retained influence over their opinion. Throughout Mr. Stevens' deposition he consistently contradicted himself on whether he actually gave opinions about the DMs. He admitted that he had each DM present their metrics to him in an annual meeting and that he would meet with the ARDs to discuss the performances of the districts under each DM and DM performance as a whole. *Exhibit 6,* Stevens Dep. 35:20 – 36:2; Stevens Dep. 40:14 – 26:23. However, Mr. Stevens denied making any remarks on individual DMs, despite Dawn McCarter listing Earnie Douglass, Al Sunday, Mr. Brod, and Jeff Ludicke as DMs that Mr. Stevens had

expressed issues with to her. *Exhibit 3,* McCarter Dep.  49:20 – 49:13. Ms. McCarter then spent time coaching the listed DMs about Mr. Stevens' expectations. *Exhibit 3,* McCarter Dep.  46:10 – 46:19. Furthermore, Mr. Urias' admitted that Human Resources notified Mr. Stevens when Mr. Brod was put on both final notices and that Mr. Urias told Mr. Stevens when Mr. Brod resigned. *Exhibit 7,* Urias Dep.  74:2 – 74:6. Mr. Stevens would not need to be notified about the employment status of a lower-level employee, if he did not have a say in their future with the company. However, Mr. Stevens was Mr. Urias' and Ms. McCarter's direct supervisor, who were in turn, Mr. Brod's direct supervisors. Therefore, Mr. Stevens had the power and authority to influence or hold leverage over any relevant decision maker of the future of Mr. Brod's employment. As such, Mr. Stevens' discriminatory remarks pass the Court's benchmark as indirect evidence of Sprint's discrimination against Mr. Brod on the basis of his age. Sprint management personnel issued harassing write ups and made discriminatory comments towards older workers such as Mr. Brod. Thus, Sprint's actions were nothing short of adverse.

43.     Furthermore, Sprint showed bias in their treatment of Mr. Brod versus his younger counterparts. Sprint has admitted that Mr. Brod was over forty years old at the time the adverse actions were taken. Although Sprint identified several coworkers that were in Mr. Brod's age range while he worked for the company, Sprint neglected to give the proper context to those employees. For example, Mr. Stevens testified in his deposition that he perceived Vincent Senter (age 51) to be under forty years old, which would have made it possible for Mr. Senter to be treated the same as the other employees who were under forty. *Exhibit 6,* Stevens Dep. 56:15 – 57:6. Sprint also depicts Al Sunday (age 62) as an example of an older employee that had worked well at Sprint. However, Ms. McCarter identified Mr. Sunday as one of the workers that Mr. Stevens had an issue with. *Exhibit 3,* McCarter Dep.  47:23 – 48:6. Furthermore, Mr. Sunday was close to retirement so

Sprint would not need to fast track Mr. Sunday for termination because he was leaving on his own accord. *Exhibit 3,* McCarter Dep. 39:9 – 39:14.

### 5. Sprint constructively discharged Mr. Brod.

44.    Sprint cited Marsha Huskey (age 53) as a coworker over 40 who received a verbal warning. However, nine of the thirteen stores Ms. Huskey supervised were brand new and Sprint stated in interoffice emails that she was being evaluated differently from the other District Managers as a result. *Exhibit* 26, Sprint's Interoffice Email. Therefore, Sprint made a poor example of Ms. Huskey because aside from age and position, her situation is not analogous to Mr. Brod because she was predominately tasked with supervising new stores evaluated in a manner separate from Mr. Brod and the younger DMs. Furthermore, Sprint listed employees under 50 as having received verbal or written warnings. However, Sprint completely ignores that Mr. Brod did not allege that individuals under 30 were never disciplined but that individuals over 50 were disciplined with disproportionate severity. Also, Sprint ignores the fact that although they have other employees over 40 that were not given final warnings, that does not mean or imply that Mr. Brod's final warning was not driven by age related reasoning. *Allain v. Bd. of Supervisors of Univ. of Louisiana Sys.*, 81 F. Supp. 3d 502, (W.D. La. 2015) (holding that age discrimination still occurred when a younger employee over 40 received more favorable treatment than an older employee over 50 when the employees' age motivated the employer's decision). Mr. Brod's contention is clear on the face of the evidence, individuals such as Josh Mamer (age 33) were given verbal and written warnings before Mr. Urias issued a final warning, while Mr. Brod (age 50) was given a verbal warning then a final warning. *Exhibit* 23; and *Exhibit* 14; *Exhibit* 22, Josh Mamer's Write Up. Thus, there was a clear disparity between the way Mr. Brod was treated and his co-workers that were under 40.

45.     Finally, Mr. Brod was constructively discharged because of his age. Mr. Brod was fast tracked for termination when his younger counterparts such as Josh Mamer (age 33), Mathew Lewellen (41), and Sergio Valasquez (age 34) were all given verbal and written warnings as well as time to improve any alleged deficits in their performances before any further action was taken. *Exhibit* 22; *Exhibit* 24, Matthew Lewellen's Write Up; *Exhibit* 25, Sergio Valazquez. Write Up. On the other hand, Mr. Urias made it clear that he wanted Mr. Brod to leave the company with Mr. Stevens support. He was given a first final write up at the beginning of the implementation of a new metrics system without consideration of the old metric system, which is against Sprint protocol. *Exhibit 6,* Stevens Dep. 78:11 – 78:14. Furthermore, after Mr. Brod fought to have the final warning brought down to a written warning, he was immediately put on another final warning. *Exhibit* 19.

46.     The final warnings threw Mr. Brod in doubt about the security of his position with Sprint. In the Fifth Circuit, an employee shows constructive discharge from "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000) (quoting *Barrow v. New Orleans Steamship Association*, 10 F.3d 292, 297 (5th Cir. 1994)).

47.     Mr. Brod was badgered, harassed, and humiliated through the ageist emails and comments Mr. Stevens made; Mr. Urias' repeated attempts to find fault with Mr. Brod's performances; and Mr. Urias putting Mr. Brod on immediate final notices based purely on one-off events and dubious reasoning. Mr. Brod made it clear to Mr. Urias that he was leaving because of the discriminatory treatment that he faced, and Mr. Urias did not offer so much as an apology or change of behavior. *Exhibit* 20. Any reasonable individual would have known that they were being pushed out in favor of younger DMs and that it would only be reasonable to pursue other, more

equitable career options. Thus, Mr. Brod was simply using reasonable, rational, and realistic thinking when he decided to leave Sprint and it was brought on by Sprint's unrelenting discrimination behavior.

48.     As such, Mr. Brod has more than enough evidence to prove that he suffered workplace discrimination pursuant to the ADEA and TCHRA. Mr. Brod can prove that he was over the age of 40 when the facts of his case occurred and well within the protected class and that he was qualified for his position. He can show that Sprint took adverse action against him in an attempt to force him out of the company. He can show that Sprint's actions were related to his age and that younger individuals were treated more favorably. Finally, he can prove that he was constructively discharged as a result.

49.     Sprint has failed to offer a compelling reason to grant their motion for summary judgment. Sprint has not proved that they had a valid reason for disciplining him or that there were younger employees subjected to the same level of scrutiny. Furthermore, any claim that Sprint could make towards a lack of evidence on Mr. Brod's part would be heavily negated by Mr. Urias' admission to destroying notes about his meetings with Mr. Brod after Mr. Brod sought legal action against Sprint. *Exhibit 7,* Urias Dep.  105:21 – 106:21. The notes were invaluable evidence in this case that Mr. Brod has been irreversibly deprived of and Mr. Urias' actions amount to nothing short of spoliation.  However, the remaining discoverable evidence raises more than a question of fact. Therefore, Mr. Brod has enough evidence to show that Mr. Brod is able to establish a prima facie case of age-based discrimination under the ADEA and the TCHRA.

### B.  <u>Plaintiff Can Establish His Prima Facie Case of Retaliation Under the ADEA</u>

50.      Mr. Brod can establish a prima facie case of retaliation in violation of the ADEA. To prove age discrimination, Mr. Brod must show (1) that he engaged in a protected activity; (2)

that an adverse employment action occurred; and (3) that a causal link existed between the protected activity and the adverse action. *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 259 (5th Cir. 2001*); Heggemeier v. Caldwell Cty., Texas*, 826 F.3d 861, 869 (5th Cir. 2016).

51.     In this case, Mr. Brod engaged in protected activity. Protected activity under the ADEA occurs when a person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act. 29 U.S.C. § 623(d). In order for Mr. Brod's activity to be protected, he need not establish that the practice opposed was actually unlawful, but only that he had a reasonable belief that the employer was engaged in unlawful employment practices. *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000).  Mr. Brod complained to Mr. Stevens that he was felt that he was being subjected to age discrimination because Mr. Stevens placed a stronger focus on helping to advance younger employees and little to no interesting in advancing older employees. *Exhibit 2,* Brod 85:22 – 86:6. Mr. Brod also complained to Sprint's Human resources department that he was suffering from age discrimination because he was being disciplined more harshly than the other, younger employees and that Mr. Stevens sent Mr. Brod and the rest of the staff ageist emails and made ageist remarks regarding older employees such as Mr. Brod. *Exhibit* 8. In both instances he received no support or absolution. Thus, it was reasonable for him to believe that he was suffering from unlawful age discrimination, which would make his complaint to Mr. Stevens and the human resource department protected activity.

52.     Furthermore, Sprint took adverse action against Mr. Brod. Mr. Brod complained to Sprint's HR department on August 15th that the August 14th write up was a product of the age discrimination and Sprint denied Mr. Brod's ADR request on the matter. *Exhibit* 14; *Exhibit 2,* Brod Dep. 73:8 – 73:20; *Exhibit* 3. Furthermore, once Sprint rolled the final warning back to a

written warning, Mr. Urias immediately issued another final warning under the same charge without providing Mr. Brod with any additional evaluation or training to improve his performance. *Exhibit 7,* Urias Dep.  86:21 – 87:7; *Exhibit 2,* Brod Dep. 86:14 – 87:3. Both actions constitute an adverse action.

53.     The consideration of three factors may be helpful in determining whether a causal link has been demonstrated at the prima facie case stage: (1) the plaintiff's past disciplinary record, (2) whether the employer followed its typical policies and procedures when taking adverse action against the employee, and (3) the temporal relationship between the employee's conduct and the adverse act. See *Nowlin v. RTC*, 33 F.3d 498, 507–08 (5th Cir.1994).

54.     In this case, Mr. Brod had no disciplinary record prior to his July verbal warning. *Exhibit* 23. Mr. Brod worked for Sprint for three and a half years without incident and had even received an award signed by Mr. Urias for his performance five months before he left the company. *Exhibit* 9. However, Sprint decided to skip company protocol for evaluating employee metrics and ignore Mr. Brod's improved metrics under the old standard and focus on the new standard where Mr. Brod's numbers were lower before the standard 3 month-grace period was up. *Exhibit* 13, *Exhibit 7,* Urias Dep.  55:4-55:22; *Exhibit 6,* Stevens Dep. 78:11 – 78:14. Furthermore, Mr. Urias put Mr. Brod on a second final notice on October 9, 2021. By having a final write up in effect, Mr. Brod would not be able to apply for positions within the company without Mr. Stevens' permission. *Exhibit* 17. The final warning served to stunt any potential growth Mr. Brod could have had because the only way he could be considered for a position is to go through a person that had labeled Mr. Brod along with older employees as a problem. Thus, Sprint overlooked protocol to take the adverse action of issuing a final warning against Mr. Brod, which would stunt his potential mobility within the company.

55.     Furthermore, there is a close temporal proximity between Mr. Brod's ethics complaint and his second final write up. Mr. Urias admitted in his deposition that he agreed that HR was right to roll the final warning back to a written warning because Mr. Brod did not have enough time to improve, but he knew that he was going to give him another write up immediately after the first one was rolled back. *Exhibit 7,* Urias Dep. 79:20 – 80:2; Urias Dep. 81:5 – 82:4. Mr. Urias issued the second final warning that the first one was rolled back despite his belief that District Managers should be afforded considerable time to improve their performance. *Exhibit 7,* Urias Dep.  24:16 – 24:22; *Exhibit* 29. Mr. Urias giving Mr. Brod a final write-up less than two months after Mr. Brod filed an ethics complaint alleging age discrimination provides enough temporal proximity for there to be a prima facie showing of causation. *Haire v. Bd. of Sup'rs of Louisiana State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 368 (5th Cir. 2013) (holding that a nurse made a prima facie showing of causation when there was a three month temporal proximity between her job duties being decreased and her EEOC complaint). After Mr. Brod complained, Sprint denied him ADR to have the matter investigated or settled. Furthermore, the second final warning and the denial of the ADR happened within two months of Mr. Brod's HR complaint. Thus, each factor goes to show a causal link between Mr. Brod's HR complaint and the retaliatory actions that Sprint took against him.

56.     In conclusion, Mr. Brod is able to establish a prima facie case of retaliation. Mr. Brod complained to Mr. Stevens and Sprint about the ageist discrimination that he suffered and was fast tracked for termination immediately afterwards. Thus, it is clear from the temporal proximity and nature of Sprint's actions regarding the complaint that he was denied ADR and given a final warning because he dared to complain about Sprint's ageist work environment. Therefore, Mr. Brod is able to meet his burden to show prima facie age discrimination under the

ADEA.

## VI.   CONCLUSION AND PRAYER

57.     For these reasons, Sprint has failed to meet its initial summary judgment burden under Rule 56 of the Federal Rules of Civil Procedure by failing to demonstrate that it is entitled to judgment as a matter of law.  There are clear genuine issues of material fact that exist and should be reserved for the factfinder. Taking Mr. Brod evidence as true, he clearly meets his burden at this stage. Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment as to Plaintiff's ADEA and Chapter 21 claims.

Respectfully Submitted,
TB Robinson Law Group, PLLC

Terrence B. Robinson
Fed. Bar No. 14218
Texas Bar No. 17112900
Email: TRobinson@TBRobinsonlaw.com
Zachary Sanders
Fed. Bar No. 3606552
State Bar No. 24118522
Email: ZSanders@TBRobinsonlaw.com
7500 San Felipe St., Suite 800
Houston, Texas 77063
Phone: (713) 568-1723
Facsimile: (713) 965-4288
**ATTORNEYS FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this April 16, 2021, a true and correct copy of the foregoing has been mailed by certified mail, return receipt requested, to all counsel of record.

Respectfully Submitted,
TB Robinson Law Group, PLLC

Terrence B. Robinson
Fed. Bar No. 14218
Texas Bar No. 17112900
Email: TRobinson@TBRobinsonlaw.com
Zachary Sanders
Fed. Bar No. 3606552
State Bar No. 24118522
Email: ZSanders@TBRobinsonlaw.com
7500 San Felipe St., Suite 800
Houston, Texas 77063
Phone: (713) 568-1723
Facsimile: (713) 965-4288
**ATTORNEYS FOR PLAINTIFF**